**In re Nomination Paper of Arthur L. ZULICK as Candidate of the Reform Party for the office of Judge of the Court of Common Pleas for the 43rd Judicial District (Monroe County).**

**Objection of Jennifer Ann WISE, Petitioner.**

Commonwealth Court of Pennsylvania.

Argued Sept. 9, 2003.

Decided Sept. 19, 2003.

As Amended Sept. 26, 2003.

Gregory M. Harvey, Philadelphia, for petitioner.

Robertson B. Taylor, Bethlehem, for respondent.

BEFORE: PELLEGRINI, Judge, and LEADBETTER, Judge, and KELLEY, Senior Judge.

---

OPINION BY Judge PELLEGRINI.

Before this Court is a petition filed by Jennifer Ann Wise (Wise) to set aside the nomination paper of Arthur L. Zulick (Zulick) as a candidate of the Reform party in the November 4, 2003 municipal election for the office of Judge of the Court of Common Pleas for Monroe County, Pennsylvania, the 43rd Judicial District.

In May of 2003, Zulick was cross-filed on the Republican and Democratic ballots as a candidate for the office of Judge of the Court of Common Pleas of Monroe County,[1] but was defeated on both tickets. Following his loss in the primary, Zulick was contacted by the Reform party, a minor political party[2] in Monroe County, and invited to become the Reform party candidate. Zulick circulated papers for his nomination[3] and after acquiring the requisite number of signatures, filed them with the Pennsylvania Department of State, Bureau of Elections on July 30, 2003. As part of that filing, he completed a candidate's affidavit which he alleged did not require him to declare that he had been a candidate in the Republican and/or Democratic primary.

Wise then filed a petition in this court to set aside Zulick's nomination paper contending that because he ran on both the Republican and Democratic ballots in the May 2003 primary, he was forbidden from being a Reform party candidate in the November 2003 general election. Citing *In Re: Substitute Nomination Certification of Moran,* 739 A.2d 1168 (Pa.Cmwlth. 1999), she contends that Sections 951(e)(5) and 976(e) of the Election Code, 25 P.S. §§ 2911(e)(5)[4] and 2936(e),[5] require him to state in the affidavit that his name had been presented as a candidate for both the Democratic and Republican nominations in the primary election of May 20, 2003, thereby precluding the Reform party from nominating him as a candidate.[6] She fur-

---

**1.** Also running on the ballot were Wise and Mark P. Pazuhanich.

**2.** "Minor political party" is defined as:

a political party as defined in section 801(a) or (b) whose State-wide registration is less than fifteen per centum of the combined State-wide registration for all State-wide political parties as of the close of the registration period immediately preceding the most recent November election.

Section 912.2(a) of the Election Code, Act of June 3, 1937, P.L. 1333, *as amended,* added by the Act of February 19, 1986, P.L. 29, 25 P.S. § 2872.2(a).

**3.** *See* 25 P.S. § 2872.2(a).

**4.** 25 P.S. § 2911(e)(5) provides:

There shall be appended to each nomination paper offered for filing an affidavit of each candidate nominated therein, stating—

\* \* \*

(5) that his name has not been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor has he been nominated by any other nomination papers filed for any such office.

**5.** 25 P.S. § 2936(e) prohibits the filing of a nomination paper if the candidate named therein has filed a nomination petition for any public office for the ensuing primary or has been nominated for any such office by nomination papers previously filed.

**6.** At the time Zulick filed his affidavit, the Department of State did not enforce the requirements in Sections 951(e)(5) and 976(e) of the Election Code, 25 P.S. §§ 2911(e)(5) and 2936(e), because it relied upon the Third Circuit's decision in *Reform Party of Allegheny County v. Allegheny County Department of Elections,* 174 F.3d 305 (3rd Cir.1999), allowing any political party and political body to cross-file for the office of judge of a court of common pleas and not enforce the statute's prohibition of both minor political parties and political bodies from nominating for any office a candidate whose name appeared on the primary ballot as a candidate for nomination by any of the major political parties for the same office. *See* Department of State's March 6, 2003 memorandum. How-

ther contends that such provisions are constitutional because the General Assembly placed such provisions in the Election Code to preclude so-called "sore loser" candidates, i.e., candidates who lose a major party primary but run on a minor party ticket in the general election. *See Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Citing *Reform Party of Allegheny County v. Allegheny County Department of Elections (Patriot Party II)*, 174 F.3d 305 (3rd Cir. 1999), Zulick responds by contending that those provisions are unconstitutional because they violate the equal protection rights of minor party candidates by prohibiting the cross-nomination of candidates by minor parties but not by major parties.

Because *Moran* is a decision of this court and would control, its applicability will be addressed first. Moran was the unsuccessful candidate in both the Democratic and Republican primary election in 1999 for the office of District Justice in Magisterial District 45–3–04 in Lackawanna County. After the primary, the Lackawanna Reform Committee, an independent political body[7] whose candidate had withdrawn, nominated Moran for the office of District Justice. When objections were made to the Substituted Nomination Certificate, the Court of Common Pleas of Lackawanna County dismissed the objections stating that "unsuccessfully seeking the nomination of a political party during the primary election does not preclude the substitution of such a defeated candidate as a political body's candidate in the ensuing November General Election." 739 A.2d at 1169. However, on appeal, we reversed, noting that this matter involved a political body rather than a political party and held that the substitution was prohibited under Section 980 of the Election Code[8] because a political body could not substitute as its candidate any person who had been a political party candidate which Moran had been in the primary election.

We noted in *Moran* that in *Storer v. Brown*, the United States Supreme Court upheld the constitutionality of a similar California election statute which prohibited a candidate from switching to an independent party for one year following an unsuccessful attempt to secure either the Democratic or Republican party nomination in the primary election. We also observed

---

ever, after our decision in *Moran* was filed, the Department of State changed its position explaining that the holding in *Moran* was controlling and that minor political parties and political bodies were again prohibited from nominating for any office a candidate whose name had appeared on the primary ballot as a candidate for nomination by any of the major political parties for the same office. *See* Department of State's August 12, 2003 memorandum.

7. The Election Code makes the distinction between a "political body" and a "political party" as follows: a "political party" is a group that receives more than a certain number of votes at the preceding general election and is permitted to select its candidates by the primary election method after which the prospective candidate places his or her name on the primary ballot by filing a nomination peti-

tion. Any other political group is a "political body" and must select its candidates by filing nomination papers. *See* Section 801 of the Election Code, 25 P.S. § 2831; *Packrall v. Quail*, 411 Pa. 555, 192 A.2d 704 (1963).

8. Section 980 of the Election Code provides:

A *political body* may substitute an individual as its candidate....

Provided, however, That no substitute nomination certificate shall nominate any person *who was a candidate for nomination by any political party for any office* to be filled at the ensuing November election, whether or not nominated for such office by such political party, or who has already been nominated by any other political body for any office to be filled at the ensuing November or special election. (Emphasis added.) 25 P.S. § 2940.

that the provision at issue prevented losers from continuing to struggle and limited the names on the ballot to individuals who had won the primaries. We held that Section 980 of the Election Code was not unconstitutional because it was "a legitimate effort on the part of the Pennsylvania General Assembly to provide clear choices to the electorate and to preclude so-called 'sore-loser' candidacies." 739 A.2d at 1172.

*Moran*, while instructive, is not controlling because it dealt with the Lackawanna Reform Committee as a political *body*, not as a political *party*, which is at issue in this case, and it also dealt with the *substitution* of a candidate, not the *nomination* of a candidate, which involved different sections of the Election Code than are at issue in this case.

While *Moran* would have been controlling if it dealt with the same factual situation, even though it discussed in *dicta* whether the challenged provisions violated equal protection when a minor party desired to nominate "sore losers," the Third Circuit's decision in *Patriot Party II*, 174 F.3d 305, is also not controlling because it dealt with whether a minor party could nominate a "happy winner" and not a "sore loser" of a major party's primary where cross-filing was permitted. In any event, even if it had an identical factual situation, it still would not be controlling because decisions of intermediate federal courts are not binding on state courts. *See Weaver v. Pennsylvania Board of Probation and Parole*, 688 A.2d 766 (Pa.Cmwlth. 1997). *See also Howlett v. Rose*, 496 U.S. 356, 110 S.Ct. 2430, 110 L.Ed.2d 332 (1990). *Patriot Party II* was the reconsideration of the Third Circuit's decision in

*Patriot Party of Allegheny County v. Allegheny County Department of Elections (Patriot Party I)*, 95 F.3d 253 (3rd Cir. 1996). While not controlling for those reasons, nonetheless, like *Moran*, it is still instructive.

In the *Patriot Party* cases, the Patriot party, a minor political party, alleged that Sections 951 and 976 of the Election Code prevented it from nominating its chosen candidate, Michael Eshenbaugh, for school director in violation of its right of free association and right to equal protection of the laws. Eshenbaugh had previously been nominated by the Democratic party but lost his bid for the Republican nomination, and the Patriot party also desired to nominate him by petition for school director in the North Allegheny School District, even though he had also won the Democratic primary. In determining whether the Patriot party's right of freedom of association had been violated, the Third Circuit utilized a fact intensive balancing test to weigh the burden on the minor party against the importance of the interest that the state offered to justify the burden. "If the burden on the plaintiff's rights is severe, the state's interest must be compelling and the law must be narrowly tailored to serve the state's interests." *Id.* at 258.

The Patriot party alleged and the Third Circuit agreed that the restrictions in the statute prevented it from nominating the individual whom the Patriot party thought would be the most effective person to advance its platform and deprived the Patriot party of an opportunity to "fuse" its votes with those of a major party and make inroads into the political process.[9] "By

---

9. The Third Circuit explained that minor parties were usually unable to garner sufficient votes to win the general election, and voters who supported the minor party's platform were *reluctant* to waste their votes on minor

party candidates who had no real chance of winning. However, cross-nominations allowed voters to vote for a minor party without wasting their votes on a candidate who had no chance of winning the election because a

preventing cross-nomination and fusion, Pennsylvania's election laws burdened the Patriot Party's ability to choose a candidate and to organize and gain influence in the political system." *Id.* at 263. The Third Circuit rejected the County Department of Elections' argument, i.e., that restrictions on cross-nomination by minor parties only imposed a minimal burden on a party's free association rights because the election laws only allowed cross-filing by the major parties in races for three local offices, finding that limitation on the effect of an election was not dispositive.

The Third Circuit also rejected the Department of Elections' argument that the election laws furthered four important state interests: [10] 1) preventing "sore loser" candidacies; 2) preventing individual candidates from monopolizing the ballot and causing voter confusion; 3) preventing a candidate from bleeding off votes of independent voters to bolster his or her major party endorsement; and 4) encouraging new candidates to run as independents. Regarding the issue of a "sore loser," the Third Circuit found that the law was both too broad and too narrow in its discrimination because, while the Election Code prevented a "sore loser" candidate who did not win a major party primary from running as a minor party candidate in the general election, it did not bar a minor party from nominating a candidate even if that individual did not lose either primary race and was not a "sore loser." It also did not prevent a candidate from continuing on as a Democratic candidate, for example, if he had lost the Republican primary. As to minor party candidates monopolizing the ballot and/or causing vot-

er confusion, the Court found no evidence of either and stated that Pennsylvania still retained the authority to set reasonable requirements for parties seeking admission to the ballot. As to the third and fourth reasons advanced, the Court found that this was not a question of candidates bleeding off minor party votes but rather a voluntary transfusion of minor party support to a major party candidate, and that cross-nominations would not increase a major party's share of minor party votes unless the minor party voluntarily nominated the major party candidate as its own. Finally, there was no evidence that a minor party's cross-nomination of a willing major party candidate would disrupt political parties in any way. Consequently, the Third Circuit held that the election laws' prohibition of cross-nomination by minor parties violated the Patriot party's right of free association.

The Third Circuit then addressed the issue of the violation of the Patriot party's equal protection of the law. Measuring the totality of the burden that the law placed on the voting and associational rights of the Patriot party and individual voters against the justification that the County Department of Elections offered to support the state election laws, the Court concluded that the Pennsylvania election laws treated major and minor parties differently and violated equal protection.

After *Patriot Party I* was decided, the United States Supreme Court issued its decision in *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997), a case involving Minnesota's election laws that prohibited a

---

voter simply voted for the candidate on any one of the party tickets and then the general election votes that the candidate received on each party ticket were added together to determine the winner.

10. The Commonwealth of Pennsylvania inexplicably did not participate in the *Patriot Party* cases even though notice of the proceeding was given to the Attorney General of Pennsylvania.

candidate from appearing on the ballot as the candidate of more than one party. Unlike the Pennsylvania election laws in *Patriot Party I* that only involved a ban on cross-nominations by minor parties, the Minnesota election laws involved an across-the-board ban on cross-nominations by both major and minor parties. Also, *Timmons* did not address the equal protection issue raised in *Patriot Party I*, but only the issue of freedom of association. In considering that issue, the Supreme Court weighed the character and magnitude of the burden Minnesota's election laws imposed on the rights of potential candidates against the interests it contended justified that burden and considered the extent to which its concerns made the burden necessary. The Supreme Court ultimately held that Minnesota's election laws prohibiting cross-nominations did not violate the freedom of association because it did not severely burden the political party's associational rights:

> In sum, Minnesota's laws do no restrict the ability of the New Party and its members to endorse, support, or vote for anyone they like. The laws do not directly limit the Party's access to the ballot. They are silent on parties' internal structure, governance, and policy making. Instead, these provisions reduce the universe of potential candidates who may appear on the ballot as the Party's nominee only by ruling out those few individuals who both have already agreed to be another party's candidate and also, if forced to choose, themselves prefer that other party. They also limit, slightly, the Party's ability to send a particularized message, to its candidate and to the voters and to its preferred candidates. We conclude that the burdens Minnesota imposes on the Party's First and Fourteenth Amendment asso-

ciational rights—though not trivial—are not severe.

520 U.S. at 363, 117 S.Ct. 1364.

Based on the holding in *Timmons*, the Department of Elections in *Patriot Party II* requested a rehearing before the Court of Appeals *en banc*. The Court was asked to determine to what extent its earlier decision in *Patriot Party I* remained good law in light of *Timmons*. The Court held that *Timmons* did not overrule the equal protection analysis and holding of *Patriot Party I* because the Minnesota election law upheld in *Timmons* banned cross-nominations by all political parties, whereas the Pennsylvania election laws at issue only banned cross-nominations by minor political parties yet allowed them by major political parties. The Court went on to perform an identical analysis of the burden placed on the minor party and its voters versus the state interest in prohibiting cross-nominations in determining that there was a violation of equal protection. It again reviewed the four state interests advanced by the Department of Elections to allow the prohibition: 1) preventing "sore loser" candidacies; 2) preventing individual candidates from monopolizing the ballot and causing voter confusion; 3) preventing a candidate from bleeding off votes of independent voters to bolster his or her major party endorsement; and 4) encouraging new candidates to run as independents. The Court did not find any of the state interests so compelling or weighty to allow the invidious discrimination in violation of minor parties' right to equal protection of the laws to continue.

Because neither *Moran* nor *Patriot Party II* are controlling, we must conduct our own analysis to determine whether the challenged provisions violate the Fourteenth Amendment to the United States Constitution.

"Voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi,* 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (quoting *Illinois Board of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979)). However, the right to vote and the right to "associate for political purposes through the ballot" are not absolute. *Burdick,* 504 U.S. at 433, 112 S.Ct. 2059. The Constitution provides that states may prescribe, "[t]he Times, Places and Manner of holding Elections for Senators and Representatives," Art. I, § 4, cl. 1, and following that constitutional mandate, the Supreme Court has recognized that states retain the power to regulate their own elections. *See e.g., Sugarman v. Dougall,* 413 U.S. 634, 93 S.Ct. 2861, 37 L.Ed.2d 853 (1973); *Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986).

In the states' exercise of that power, the Supreme Court has stated that "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Burdick,* 504 U.S. at 441, 112 S.Ct. 2059 (quoting *Storer v. Brown,* 415 U.S. at 730, 94 S.Ct. 1274 (1974)). In fashioning "some sort of order," election laws will invariably impose some burden upon individual voters and political parties, especially those rights guaranteed by the First and Fourteen Amendment to the United States Constitution. Each provision of an election code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote

and his right to associate with others for political ends." *Anderson v. Celebrezze,* 460 U.S. 780, 788, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983).

Where there is a challenge to a provision of an election law, the Supreme Court, in *Clements v. Fashing,* 457 U.S. 957, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982), stated the following regarding the analysis to be used to determine whether a violation had been made out when there had been an allegation that an Election Code provision violated the Equal Protection Clause to the United States Constitution:

The Equal Protection Clause allows the States considerable leeway to enact legislation that may appear to affect similarly situated people differently. Legislatures are ordinarily assumed to have acted constitutionally. Under traditional equal protection principles, distinctions need only be drawn in such a manner as to bear some rational relationship to a legitimate state end. Classifications are set aside only if they are based solely on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be conceived to justify them. See, e. g., *McDonald v. Board of Election Comm'rs,* 394 U.S. 802, 808–809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969); *McGowan v. Maryland,* 366 U.S. 420, 425–426, 81 S.Ct. 1218, 6 L.Ed.2d 393 (1961). We have departed from traditional equal protection principles only when the challenged statute places burdens upon "suspect classes" of persons or on a constitutional right that is deemed to be "fundamental." *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

Thus, we must first determine whether the provisions challenged in this case deserve "scrutiny" more vigorous than that which the traditional principles

would require.[11] Far from recognizing candidacy as a "fundamental right," we have held that the existence of barriers to a candidate's access to the ballot "does not of itself compel close scrutiny." *Bullock v. Carter*, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). "In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." Ibid. In assessing challenges to state election laws that restrict access to the ballot, this Court has not formulated a "litmus-paper test for separating those restrictions that are valid from those that are invidious under the Equal Protection Clause." *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Decision in this area of constitutional adjudication is a matter of degree, and involves a consideration of the facts and circumstances behind the law, the interests the State seeks to protect by placing restrictions on candidacy, and the nature of the interests of those who may be burdened by the restrictions. Ibid.; *Williams v. Rhodes*, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968).

Our ballot access cases, however, do focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the "availability of political opportunity." *Lubin v. Panish*, 415 U.S. 709, 716, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974). This Court has departed from traditional equal protection analysis in recent years in two essentially separate, although similar, lines of ballot access cases.[12]

\* \* \*

The second line of ballot access cases involves classification schemes that impose burdens on new or small political parties or independent candidates. See, e.g., *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *Storer v. Brown, supra*; *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974); *Jenness v. Fortson*, 403 U.S. 431, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971); *Williams v. Rhodes, supra*. These cases involve requirements that an independent candidate or minor party demonstrate a certain level of support among the

---

**11.** Under a typical Fourteenth Amendment analysis of governmental classifications, there are three different types of classifications calling for three different standards of judicial review. The first type—classifications implicating neither suspect classes nor fundamental rights—will be sustained if it meets a "rational basis" test. In the second type of cases, where a suspect classification has been made or a fundamental right has been burdened, another standard of review is applied: that of strict scrutiny. Finally, in the third type of cases, if "important," though not fundamental rights are affected by the classification, or if "sensitive" classifications have been made, the United States Supreme Court has employed what may be called an intermediate standard of review or a heightened standard

of review. *See Nicholson v. Combs*, 550 Pa. 23, 703 A.2d 407 (1997).

The heightened standard of review lessens the presumption that a statute is constitutional because it allows the court to weigh the proffered reasons why the restrictions are against the rights purportedly being infringed upon. Strict scrutiny goes even farther, as Tribe, *American Constitutional Law* (Second Edition), Section 16–6 quipped: "[w]hen expressed as a standard for judicial review, strict scrutiny is … 'strict' in theory and usually 'fatal' in fact."

**12.** The first line of ballot access cases mentioned involved classifications based on wealth which is not at issue in this case.

electorate before the minor party or candidate may obtain a place on the ballot. In these cases, the Court has emphasized that the States have important interests in protecting the integrity of their political processes from frivolous or fraudulent candidacies, in ensuring that their election processes are efficient, in avoiding voter confusion caused by an overcrowded ballot, and in avoiding the expense and burden of run-off elections. To this end, the Court has upheld reasonable level-of-support requirements and classifications that turn on the political party's success in prior elections. See *Storer v. Brown*, supra; *American Party of Texas v. White*, supra; *Jenness v. Fortson*, supra. The Court has recognized, however, that such requirements may burden First Amendment interests in ensuring freedom of association, as these requirements classify on the basis of a candidate's association with particular political parties. Consequently, the State may not act to maintain the "status quo" by making it virtually impossible for any but the two major parties to achieve ballot positions for their candidates. See *Williams v. Rhodes*, supra, at 25, 89 S.Ct. 5.

\* \* \*

It does not automatically follow, of course, that we must apply traditional equal protection principles … merely because these restrictions on candidacy do not fall into the two patterns just described. But this fact does counsel against discarding traditional principles without first examining the nature of the interests that are affected and the extent of the burden these provisions place on candidacy. See *Bullock v. Carter*, supra, 405 U.S. at 143, 92 S.Ct. at 855; *Storer v. Brown*, supra, 415 U.S. at 730, 94 S.Ct. at 1279. Not all ballot access

restrictions require "heightened" equal protection scrutiny. The Court, for example, applied traditional equal protection principles to uphold a classification scheme that denied absentee ballots to inmates in jail awaiting trial. *McDonald v. Board of Election Comm'rs*, 394 U.S. at 807–811, 89 S.Ct. at 1407–1409.

*Id.* at 963–966, 102 S.Ct. 2836.

■ The first issue that must be addressed in deciding whether Sections 951 and 976 of the Election Code, 26 P.S. § 2911(3)(5) and § 2936(e), violate the Equal Protection Clause to the United States Constitution by not allowing minor parties to nominate as their candidate for an office in the general election candidate who stood for office in the primary where cross-filing was permitted is to determine which level of scrutiny is appropriate. In *Timmons*, the United States Supreme Court applied an intermediate level of scrutiny in which "the State's asserted regulatory interests need only be 'sufficiently weighty to justify the limitation' imposed on the [minor party's] rights." 520 U.S. at 364, 117 S.Ct. 1364 (citing *Norman*, 502 U.S. at 288–89, 112 S.Ct. 698). Under this standard, the Court indicated that it would not "require elaborate, empirical verifications of the weightiness of the State's asserted justifications." *Id.* (citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986)). Once the justification is advanced, under the intermediate level of scrutiny standard, the court is to weigh against the burdens imposed any plausible justification the state has advanced for imposing unequal burdens on major and minor parties. *Cf. Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) ("[E]ven in the ordinary equal protection case calling for the most deferential of standards, we insist on knowing the

relation between the classification adopted and the object to be attained.") While *Timmons* involved an associational rights analysis, it is equally applicable to an equal protection analysis.

At the outset of our equal protection analysis, it should be noted that the Supreme Court has held that the different treatment of minor political parties from other political parties does not violate their equal protection. In *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), the question was raised whether an election law requiring that large parties hold primary elections but also mandating that smaller parties nominate by convention violated the First or Fourteenth Amendments. In holding the provision valid, the Court stated:

Neither can we take seriously the suggestion made here that the State has invidiously discriminated against the smaller parties by insisting that their nominations be by convention, rather than by primary election. We have considered the arguments presented, but are wholly unpersuaded by the record before us that the convention process is invidiously more burdensome than the primary election.... If claiming an equal protection violation, the appellant's burden was to demonstrate in the first instance a discrimination against them of some substance. Statutes create many classifications which do not deny equal protection; it is only invidious discrimination which offends the Constitution. Appellants' burden is not satisfied by mere assertions that small parties must proceed by convention when major parties are permitted to choose their candidates by primary election. The procedures are different, but the Equal Protection Clause does not necessarily forbid the one in preference to the other.

*Id.* at 781–82, 94 S.Ct. 1296 (internal quotation marks and citations omitted). The Court further reasoned that:

The fact is that there are obvious differences in kind between the needs and potentials of a political party with historically established broad support, on the one hand, and a new or small political organization on the other. [A State is not] guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot. Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike.

*Id.* at 782, n. 13, 94 S.Ct. 1296 (quoting *Jenness v. Fortson*, 403 U.S. 431, 441–491, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971)).

We then need to determine whether Sections 951 and 976 of the Election Code, 26 P.S. § 2911(3)(5) and § 2936(e), invidiously discriminate against minor parties because they "unfairly or unnecessarily burden the availability of political opportunity" as those provisions do not allow them to nominate a losing candidate that took part in the type of primary election that allowed candidates to cross-file in the other party's primary. To do so, we need to determine whether the prohibition gives major party nominees an unfair advantage over minor party nominees placing a greater burden on minor parties from appearing on the ballot. For several reasons, we hold that it does not.

First, the important state interests advanced by the state in *Timmons* that the Supreme Court found justified impinging on the right of freedom of association are equally applicable to whether the provisions here violate equal protection because those interests also establish that treating minor and major political parties differently do not "unfairly burden the political

opportunity" of minor parties. Balancing then the importance of the state's interest in foreclosing the nomination of "sore losers," *Storer v. Brown*, and the reasons set forth in *Timmon's* justifying the burden imposed on minor political parties, under the intermediate level of scrutiny standard, we find, though not trivial, those burdens are not so "severe" so as to declare Sections 951(e)(5) and 976 of the Election Code unconstitutional. Foreclosing it from nominating a "sore loser" does not restrict the ability of the minor political party and its members to endorse, support or vote for anyone they like; instead, it only limits the minor political party's access to the ballot by reducing the universe of potential candidates who may appear on the ballot as the party's nominee by ruling out those few individuals who have lost on a primary ballot. Moreover, even if we were to permit a "sore loser" to be on the ballot, that allowance would discriminate against other candidates and other political bodies. If we were to hold that a minor party could select a "sore loser" by nomination, that would discriminate against other candidates who, if a minor party was required to hold a primary, could challenge the party's endorsed choice and "shanghai" the nomination process, as well as discriminate against other political bodies who could not nominate "sore losers."

Second, a statutory scheme that favors minor parties necessarily cannot so "unfairly burden" the minor party as to constitute invidious discrimination. Sections 951(e)(5) and 976 of the Election Code are part of an overall legislative scheme that was enacted to aid the minor party, not to harm them. The requirement that minor parties are to nominate candidates only through the nomination process is done in part so that that the minor parties, which have gained support at the general election of member of other parties and indepen-

dents, can continue to appear on the general election ballot, even though it may not have enough members of its own party to have sufficient signatures to even nominate a candidate for a primary. For example, a candidate for judge in Monroe County is required to obtain 250 signatures of party electors to run on that party's primary ballot. 25 P.S. § 2872.1(28). In this case, because the Reform party only had 94 registered electors as of the 2003 primary, it did not have enough signatures to even get a candidate on the ballot in the primary election. Absent nominating a candidate in the primary, if it was treated the same as a "major party," it would then be precluded from fielding a candidate in the general election. Even if a minor party had more than 250 registered minor party members, making it possible for it to nominate a candidate in a primary where cross-filing is permitted, it would practically be impossible for the party to field a candidate unless it had hundreds, if not thousands, of registered voters. This is so because if a number of candidates take out petitions, including all minor party members, that number would have to increase substantially, taking into consideration that other candidates could also solicit signatures from some party members who always refuse to sign any petition or cannot be contacted. Even if one candidate could get 250 signatures, nothing would prevent the nomination from being "shanghaied" by a better organized and well-known Democrat or Republican who could obtain the signatures for that party's nomination and win the election. Because a minor party is guaranteed to run a candidate in the general election which may not be able to run otherwise, the provisions here do not constitute invidious discrimination.

Finally, there is no "unfair burden on the political opportunity of a minor party"

so as to constitute invidious discrimination in precluding a "sore loser" from being a candidate in the general election because no political party, minor political party or political body under the Election Code is allowed to nominate a "sore loser," and no "sore loser" is allowed to run on another party's ballot that he did not win or lose on in the general election. In effect, what is being challenged in this case is not that "sore losers" are not being treated the same, but that minor political parties are being treated unequally because they are foreclosed from participating in primary elections and some candidates might not be available. However, when the Supreme Court in *American Party of Texas v. White*, 415 U.S. 767, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974), upheld the statutory scheme of not allowing minor political parties to participate in the primary election, any effect that followed was a necessary result of the protection afforded to the minor parties by not going through primaries and, as *Timmons* held, just because a few candidates are not available, that does not amount to invidious discrimination required to make out an equal protection claim.[13]

Accordingly, because we find that Sections 951(e)(5) and 976 of the Election Code are constitutional, Wise's petition to set aside Zulick's nomination paper is granted.

### *ORDER*

AND NOW, this 19th day of September, 2003, the Petition to Set Aside the Nomination Paper of Arthur L. Zulick is granted.

---

**13.** Because only the issue of a "sore loser" is at issue in this case, we decline to address whether a minor party can nominate a "happy winner" of a major party primary where cross-filing is permitted as was the issue in the 3rd Circuit's decision in Patriot *Party II*.