858 A.2d 1167

**In re Nomination Papers of Ralph NADER and Peter Miguel Camejo as Candidates of an Independent Political Body for President and Vice President in the General Election of November 2, 2004.**

**Linda S. Serody, Roderick J. Sweets, Ronald Bergman, Richard Trinclisti, Terry Trinclisti, Bernie Cohen–Scott, Donald G. Brown and Julia A. O'Connell, Objectors.**

**Appeal of Ralph Nader and Peter Miguel Camejo, and their Independent Electors.**

Supreme Court of Pennsylvania.

Submitted Sept. 10, 2004.

Per Curiam Order Sept. 20, 2004.

Decided Sept. 29, 2004.

24

Samuel C. Stretton, West Chester, for Peter Miguel Camejo and Ralph Nader.

Christopher K. Walters, Philadelphia, Daniel I. Booker, Pittsburgh, Ira Steven Lefton, Philadelphia, for Linda S. Serody.

Jeremy David Feinstein, Pittsburgh, Milind Madhukar Shah, Philadelphia, for Roderick J. Sweets.

Efrem M. Grail, Pittsburgh, for Ronald Bergman.

Cynthia E. Kernick, Pittsburgh, for Richard Trinclisti.

Brian Anthony Gordon, Gregory M. Harvey, Philadelphia, for Julia A. O'Connell.

Louis Lawrence Boyle, for Bureau of Com'rs, Elections and Legislation.

BEFORE: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR, EAKIN and BAER, JJ.

### ORDER

PER CURIAM.

**AND NOW,** this 20th day of September, 2004, the Order of the Commonwealth Court dated August 30, 2004 is **REVERSED** and **VACATED,** and the matter is **REMANDED** on an expedited basis for hearings on the Petition to Set Aside the Nomination Papers of Ralph Nader and Peter Miguel Camejo.

The Petition for Review of the Denial of a Request for a Stay and Supersedeas is dismissed as moot.

Opinion to follow.

### OPINION

Justice NEWMAN.

In this case, we must determine whether Ralph Nader (Nader) and Peter Miguel Camejo (Camejo) (collectively, the Candidates) will appear on the November 2, 2004 Pennsylvania General Election ballot (the ballot) as Independent Politi-

cal Body candidates for the respective offices of President and Vice President of the United States. We reject the Commonwealth Court's determination that Section 951(e) of the Election Code, 25 P.S. § 2911(e), as applied to Candidates, disqualifies them from appearing on the ballot. For the reasons that follow, we reverse the Order of the Commonwealth Court, which set aside the Nomination Papers of the Candidates and directed the Secretary of State not to print their names on the ballot for the 2004 Pennsylvania General Election, and remand for an expedited hearing on the validity of the signatures.

## FACTS AND PROCEDURAL HISTORY

### The Parties

The case involves the upcoming Presidential election and the right of Ralph Nader and Peter Miguel Camejo to appear as candidates of an Independent Political Body for President and Vice President of the United States on the ballot for the Pennsylvania General Election scheduled for November 2, 2004.

Appellees, Linda S. Serody *et al.* (the Objectors), are registered voters in Pennsylvania who filed objections to the Nomination Papers[1] that Nader and Camejo filed on August 2, 2004, with the Secretary of the Commonwealth of Pennsylvania seeking to have their names printed on the November 2, 2004 Pennsylvania General Election ballot as Independent candidates for the respective offices of President and Vice President. The Nomination Papers included 52,398 signatures in support of their candidacy.[2]

1. Pursuant to the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, as amended, 25 P.S. §§ 2600–3591 (Election Code), candidates who run in party primaries file "nomination petitions" and those who are candidates of political bodies (independent of minor parties) file "Nomination Papers." Those filing Nomination Papers, such as Nader and Camejo, must obtain a number of signatures equal to two percent (2%) of the last highest vote obtained in a statewide election. Section 951(b) of the Election Code. In this case, Nader and Camejo were required to obtain the signatures of 25,697 individuals, based on the number of votes that Justice Max Baer received in the last statewide election.

2. Objectors allege that the number of signatures was "more than 47,000." Petition to Set Aside the Nomination Papers of Ralph Nader

## The Objectors' Challenges

### A. The Election Code

Objectors contend that, pursuant to Section 951(e) of the Election Code,[3] the Candidates are further disqualified from appearing on the Ballot because they were placed on the Michigan general election ballot as the nominated Presidential and Vice Presidential candidates of the Reform Party of Michigan.[4]

The Registrar of Voters in the County of Sacramento certified that on April 27, 2004, Camejo was registered in Sacramento County as a member of the Green Party and that

and Peter Miguel Camejo as Candidates of an Independent Political Body for President and Vice President of the United States, ¶ 5, (Petition), Reproduced Record (RR) at A–39.

3. Section 951(e) of the Election Code provides that:

(e) There shall be appended to each Nomination Paper offered for filing an affidavit of each candidate nominated therein, stating—(1) the election district in which he resides; (2) the name of the office for which he consents to be a candidate; (3) that he is eligible for such office; (4) that he will not knowingly violate any provision of this act, or of any law regulating and limiting election expenses, and prohibiting corrupt practices in connection therewith; (5) that his name has not been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor has he been nominated by any other Nomination Paper filed for any such office; (6) that in the case where he is a candidate for election at a general or municipal election, he was not a registered and enrolled member of a party thirty (30) days before the primary held prior to the general or municipal election in that same year; (7) that, in the case where he is a candidate for election at a special election, he is not a registered and enrolled member of a party.

25 P.S. § 2911(e) (emphasis added).

This section is sometimes referred to as the "sore loser" provision, because it is generally intended to prevent losers of party primaries from running as independents. *In re Zulick*, 832 A.2d 572 (Pa.Cmwlth. 2003), *aff'd*, 575 Pa. 140, 834 A.2d 1126 (2003) (candidate for judge of the Court of Common Pleas cross-filed on the Republican and Democratic ballots in the May 2003 primary and was defeated on both tickets. He then circulated Nomination Papers to run as a candidate of the Reform Party for the same position in the November 2003 election. The Commonwealth Court held that forbidding a candidate who ran in a primary for a major party from running in a general election as a candidate for a minor party did not violate equal protection).

4. The question of whether or not Candidates will appear on the Michigan ballot as Reform Party candidates is currently in litigation in that state.

he registered with that party on July 29, 2003. The Objectors contend that because of this, his nomination in Pennsylvania violates Section 951.1 of the Election Code, 25 P.S. § 2911.1, which requires that Pennsylvania independent candidates disaffiliate from a political party in Pennsylvania thirty days before the primary election.[5] The Objectors contend that Camejo's Affidavit dated July 28, 2004, which claimed that he was not an enrolled member of a political party, constituted a false representation, because Camejo was, at that time, an enrolled and registered member of the Green Party in California.

### B. *The Challenges to the Signatures*

On August 9, 2004, the Objectors filed a Petition that challenged approximately 34,000–35,000 of the signatures, alleging, *inter alia*, that the Nomination Papers contained numerous defective or illegible signatures, as well as those of unregistered voters and fictitious persons.[6] Further, the Objectors contested the supporting Affidavits of those who circulated the Nomination Papers The Nomination Papers consisted of 1,189 separate documents, accompanied by the Candidates' Affidavits. Petition at ¶ 4. The Objectors received the Candidates' Nomination Papers on August 3, 2004, and by August 9, 2004, had to complete their review of the signatures. They produced several volumes, documenting each signature that they were challenging and explaining the basis for the challenges. Transcript at 105. Objectors worked round-the-clock, cancelled vacations, and brought in volunteers. *Id.*

5. § 2911.1 Limitations on eligibility of candidates

 Any person who is a registered and enrolled member of a party during any period of time beginning with thirty (30) days before the primary and extending through the general or municipal election of that same year shall be ineligible to be the candidate of a political body in a general or municipal election held in that same year nor shall any person who is a registered and enrolled member of a party be eligible to be the candidate of a political body for a special election.

6. Objectors' counsel stated at the hearing that they were challenging 37,000 signatures. Transcript of Hearing of August 27, 2004 (Transcript) at 81.

Because of the alleged deficiencies, the Objectors argue that the Nomination Papers did not contain the required 25,697 valid signatures, and that the Candidates are not qualified to appear on the ballot.

In addition to the signatures challenged by the Objectors, the Secretary of the Commonwealth, although accepting the Nomination Papers, rejected 4,936 signatures submitted by the Candidates for a variety of reasons.

### The Case Management Order

By Order dated August 11, 2004, the Commonwealth Court scheduled a status conference with parties' counsel, which was held on August 19, 2004. The Order noted that:

the purpose of the status conference is to set a date for an evidentiary hearing on the various objections.... **At the present time, the court expects to conduct simultaneous hearings on the individual signature challenges in not less than five court rooms, before five different judges, located throughout the state.**

Commonwealth Court Order dated August 11, 2004. (emphasis added). At the conference, Candidates objected to the court's Order directing the use of multiple judges sitting at different locations to hear the challenges, and requested additional time to review the signatures. The Objectors stated that they were "ready and available to begin each of the five hearings contemplated by [the August 11, 2004] Order as soon as the court requests" such hearings. Objectors' Joint Case Management and Status Conference Statement dated August 18, 2004. The court stated that it had committed four commissioned judges of the court to work on nothing else (presumably signature review) until the matter is concluded. Transcript at 18. Additionally, the court later indicated that it had five judges, and more if needed, to work on the case. *Id.* at 31. The court denied Candidates' objections on August 19, 2004, stating that time is of the essence in election matters, and reminding counsel for Candidates that the Rules of Professional Conduct require a lawyer to control his workload so that each matter may be handled adequately. Counsel for Candidates offered

to conduct a "statistical review" of a number of the signatures that were challenged, noting that if patterns of fraud were detected, the Nomination Papers would be withdrawn.[7]

The Commonwealth Court issued a *Per Curiam* Case Management Order (Case Management Order) on August 19, 2004, requiring the parties to commence their review of the Philadelphia Registration Commission records and to schedule arrangements with the Voter Registration Administrator for review of the record. In addition, the Commonwealth Court further ordered that after review of those records, the parties were to enter into a stipulation identifying the number of signatures submitted in the Nomination Papers, the number of signatures being challenged, the page and line numbers for the challenges, and the basis for the challenges or objections.[8] The Commonwealth Court, in a subsequent Order, explained that "[w]ith the substantial number of signatures at issue here . . . a fair and just resolution of the signature challenges would require the commitment of significant resources by the Candidates with the view of entering into stipulations as to many if not most of the challenged signatures." Commonwealth Court Memorandum and Order dated September 9, 2004, at 5. The Case Management Order also provided that the court would commence oral argument before a three-judge panel of the court on August 27, 2004, and that:

> [t]he President Judge of the Commonwealth Court shall convene hearings before the Court on Objectors' challenges to the Nomination Papers on Friday, September 3, 2004 and shall continue until said challenges are concluded. Counsel for the parties are to remain available for hearings at all dates and times scheduled by the Court, including evenings and weekends.

Case Management Order dated August 19, 2004, at 2. Based on its previous Order of August 11, 2004, the court intended to

---

7. The record does not contain any reference as to what, if anything, occurred with respect to this offer.

8. The Objectors note that "conventional case management directives . . . have been used in election nomination cases for almost a decade. . . ." Brief for Appellees at 21.

conduct simultaneous hearings, using the significant resources it identified and would make available to resolve the signature challenges.

## The Signature Review Process

When the Commonwealth Court convened on August 27, 2004 for the oral argument, no stipulations had been implemented. Volunteers for the Candidates had reviewed only 1,371 signatures of the 23,149 signatures that Objectors challenged in Philadelphia, or, roughly six percent (6%). Transcript at 10. Counsel for the Candidates testified that he "can't control the volunteers" and that "we didn't have enough volunteers." *Id.* Further, he testified that it took about five minutes per signature, using each available computer. *Id.* Using ten terminals, for eight hours a day, counsel stated that a thousand signatures a day could be reviewed, "if we have enough people to man ten terminals. We did yesterday, I don't know today .... the maximum we could get would be about 5,000 more signatures, 6,000 more.... I'm pushing them. I have told them they have to get me the volunteers. I don't have that stock of volunteers." *Id.* at 21–22. On the day of the hearing, volunteers were using the two available terminals in Pittsburgh. Addressing the comment of the President Judge, counsel agreed that "if that fifty-three percent not registered number ran through its course, there wouldn't be enough signatures." *Id.* at 13. Further, Candidates' counsel stated to the court that his signature review was "not proceeding fast enough." *Id.* at 17. The signature review was proceeding at an average rate of 150 signatures per day. The court noted that "[a]t this rate, less than half of the challenged signatures in Philadelphia would have been reviewed, **for the limited purpose of stipulations only,** prior to Election Day." Commonwealth Court Memorandum and Order dated September 9, 2004, at 3 (emphasis added). Further, the Commonwealth Court found that the preliminary review by Candidates' counsel showed that of the 1,371 signatures checked, fifty-three percent (53%) were not registered at all, and another twenty-one percent (21%) had address or

timing discrepancies, which were not amendable pursuant to the holdings of this Court in *In re Nomination Petition of Silcox*, 543 Pa. 647, 674 A.2d 224 (1996) and *In re Nomination Petition of Flaherty*, 564 Pa. 671, 770 A.2d 327 (2001). Transcript at 12. Further, twenty to thirty signatures were "clearly fraudulent." Transcript at 14.

Candidates' counsel estimated that he would need to review "about 20,000" more signatures in Philadelphia, and that it was "humanly impossible" to examine the allegedly defective 32,000 signatures. *Id.* at 21, 31. Based on these preliminary findings, the Commonwealth Court projected that "the rate of invalidity would place the number of signatures below the required number of 25,697." Commonwealth Court Memorandum and Order dated September 9, 2004, at 4. Counsel argued that the Commonwealth Court had not "given us time to prepare[,]" but stated that "[y]ou have bent over backwards for us, but that's not enough." *Id.* at 38–39.

### *The Commonwealth Court Order of August 30, 2004*
#### A. *The Statute*

On August 30, 2004, in a Memorandum Opinion and Order, the Commonwealth Court ordered that the Nomination Papers of the Candidates be set aside and that the Secretary of the Commonwealth be directed not to print the names of Nader and Camejo on the ballot for the 2004 Pennsylvania General Election. The Commonwealth Court found that the Candidates were disqualified because of their nomination by the Reform Party and, at the same time, dismissed their objections to the procedural standards regarding review of the signatures.[9]

The Candidates argued that they do not meet the statutory "sore losers" test because they did not run in the Pennsylvania primary. The court rejected this argument, finding that:

---

**9.** The Candidates raised three procedural objections, asserting that: (1) objections to later registrations should be stricken; (2) Pennsylvania's requirements for review of signatures and addresses are too stringent and should not be applied to them; and (3) they were not notified of the signatures that the Secretary of Commonwealth struck and were, as a result, denied due process.

case authority exists to defeat the argument that Candidates' rights would be unduly burdened if the Court were to hold that [Section 2911(e)] ... prohibits ballot status in Pennsylvania to the independent candidates for President and Vice President while they simultaneously run for the same offices as candidates in Michigan under the Reform Party nomination.

Commonwealth Court Opinion dated August 30, 2004, at 6. The court determined that the statutory language was clear and that the prohibition "does not run afoul of the state's interests in regulating elections in Pennsylvania." *Id.* at 7. The court held that because Nader and Camejo filed their Nomination Papers as candidates of the Reform Party in Michigan, they violated Section 951(e) of the Election Code, requiring that their Nomination Papers be set aside. The court further disqualified Camejo because his affidavit indicated that he was not enrolled in a political party, which was not true because of his membership in the Green Party in California.

## B. *The Challenges to the Signatures*

Having determined that the Candidates were not qualified to be on the ballot due to their Reform Party nomination, the Commonwealth Court then addressed the three procedural objections. First, Candidates argued that certain later registrations should be permitted, contending that persons who sign and mail registration cards during the circulation period may be properly registered, even though they do not appear on the registration list. The court cited as precedent *Petition of Joseph J. O'Hara,* 795 A.2d 513 (Pa.Cmwlth.2002) (single judge opinion by Simpson, J.) (holding that the postmark on the registration application was the determining factor when a registration is subsequently approved) and *In re Nomination Petition of Roth,* (Pa.Cmwlth., No. 121 M.D.2002, filed March 8, 2004) (single judge opinion by Feudale, S.J.) (concluding that where the necessary step of delivering the registration cards to an appropriate registration official was lacking, the registrations were not valid). As a result, the court in the

matter *sub judice* concluded that individuals whose applications were delivered or postmarked after the date on which they signed the Nomination Papers were not "qualified elector[s]," [10] and their signatures would be stricken. Counsel for Candidates testified that there were fifty-two signatures that fell into this category. Transcript at 12.

With respect to Candidates' second assertion that Pennsylvania case law establishes requirements for signature and address review that are too stringent,[11] the court noted that it "does not have the authority to disregard precedent set by the Supreme Court" and that it would not apply the "less stringent" standard that the Candidates requested regarding signature review. *Id.* at 10–11.

The court also rejected Candidates' third procedural challenge, which contested the striking by the Secretary of the Commonwealth of 4,936 signatures. Pursuant to Section 976 of the Election Code, 25 P.S. § 2936, where a Nomination Paper contains the requisite number of facially valid signatures, such as the one that Candidates submitted, the Secretary:

> although not hereby required to do so, may question the genuineness of any signature ... appearing thereon, and if he ... shall thereupon find that any such signature ... [is] not genuine, such signature ... shall be disregarded in determining whether the ... Nomination Paper ... contains a sufficient number of signatures as required by law....

25 P.S. § 2936. In response to Candidates' assertion that they were denied due process because they were not notified of the stricken signatures and had no opportunity to contest them, the Commonwealth Court noted that in the instant

10. Section 102(t) of the Election Code, 25 P.S. § 2602(t), defines "qualified elector" as "any person who shall possess all of the qualifications for voting now or hereafter prescribed by the Constitution of this Commonwealth, or who, being otherwise qualified by continued residence in his election district, shall obtain such qualifications before the next ensuing election."

11. Candidates referred to decisions of this Court in *Flaherty* and in *Silcox*.

matter, the Objectors had supplied all of the signatures that they were challenging, had provided the reasons for striking the signatures, and, as a result, Candidates were placed on notice of the challenge and had the opportunity to defend against it. As a result, the court dismissed the Candidates' objections to the striking of the nearly 5,000 signatures by the Secretary of the Commonwealth.

## The Requests for a Stay

Following the August 30, 2004 Order setting aside the Nomination Papers and striking the Candidates' names from the ballot, the Candidates appealed to this Court, which ordered the parties to file briefs by September 10, 2004. Pending this appeal, the Candidates requested a stay from the Commonwealth Court of its Order, which the Commonwealth Court denied on September 9, 2004. On September 13, 2004, the Candidates filed a Petition for Review of Appellants of the Denial of Their Request for a Stay and Supersedeas with this Court. Based on our disposition of the matter *sub judice*, denied Candidates' Petition as moot by Order dated September 20, 2004.

In its Memorandum and Order denying the stay, the Commonwealth Court concluded that although it had "yet to review a single signature," the likelihood of success on the ultimate merits "appears slim indeed." Commonwealth Court *Memorandum and Order* dated September 9, 2004, at 2. The court noted that on August 19, 2004, the "Candidates objected to [its] Order directing the use of multiple judges sitting at different locations to hear the challenges, and requested additional time to review the signature challenges." *Id.* at 2–3. Further, at that conference, Candidates' counsel offered to conduct a statistical review of some of the challenged signatures and to withdraw the papers if patterns of fraud were discerned. Counsel for Candidates indicated that the Objectors had talked to someone and developed a plan regarding how to select signatures to include in the random analysis. Transcript at 15–16. However, the record does not indicate that this was done.

In denying the stay, the Commonwealth Court explained that when it convened next, on August 27, 2004, the Candidates' volunteers had reviewed only 1,371 of the 23,149 signatures challenged in Philadelphia, or, roughly six percent (6%). At this rate, the court calculated that less than half of the challenged signatures in Philadelphia would be reviewed, for the limited purpose of stipulations only, prior to Election Day. *Id.* at 3. The court questioned whether Candidates' counsel had adequate resources for the matter. Because the Candidates' preliminary review showed that of the 1,371 signatures checked, fifty-three percent (53%) were not registered voters, another twenty-one percent (21%) had address or timing discrepancies, which were not amendable, and, at this rate of invalidity, the number of signatures would be below the mandated 25,697. *Id.* at 4. Accordingly, the Commonwealth Court held that Candidates were unlikely to succeed on the merits, and did not meet the criteria for a stay established by *Pennsylvania Public Utility Comm'n v. Process Gas Consumers Group,* 502 Pa. 545, 467 A.2d 805 (1983).

The court also stated that it was "uncontested that Camejo signed a false candidate's affidavit in the instant matter" and that "[t]his alone would prevent him from appearing on the ballot." Commonwealth Court Memorandum and Order dated September 9, 2004, at 4.

With respect to potential harm, the Commonwealth Court held that the Candidates, at that juncture, were not "irreparably harmed" because if the matter did proceed to signature challenges, "further delay or inability of the Candidates to commit resources for a timely review of the challenged signatures would harm the objectors, upon whom the ultimate burden of proving invalidity rests." *Id.* at 5. Because there were so many signatures involved, if the Candidates did not commit "significant resources" toward attempting to resolve as much as possible by stipulation, the result would be that "Candidates, merely by being obstreperous, could remain on the ballot through the device of delaying the Court's proceedings through Election Day." *Id.* at 5. The Commonwealth Court took notice that prospective absentee military voters

and others would have to be notified of the names to be included on the ballot, and that "[e]very time a court order changes these names, additional notifications are or may be required. The public interest, therefore, dictates that these changes should be kept to a minimum." *Id.*

The Commonwealth Court cited the failure of Candidates' counsel to cooperate in a preliminary review of signatures, even though the court placed the resources of the Philadelphia Election Commission and the Allegheny County Board of Elections at its disposal. Based on that, the court concluded that "for whatever reasons the Candidates are seeking to obstruct a timely review in all of the issues in this case." *Id.* at 6.

The Transcript contained numerous instances where Candidates' counsel complained that he lacked the time, resources, and volunteers to conduct the signature review in accordance with the Case Management Order. With regard to his involvement in the signature review process, Candidates' counsel stated that "we try to do our best, but we are busy lawyers.... I took this on with a very limited scope of representation for the Nader campaign." Transcript at 9. He further testified that "I can't control the volunteers." *Id.* at 10. "[W]e didn't have enough volunteers." *Id.* "I have not been sitting on my hands, and, yes, I have been on trial all over the state, but that's me. I try a lot of cases." *Id.* at 15. "[I]t's not proceeding fast enough, and that's the problem." *Id.* at 17. "[T]hey have to get me the volunteers. I don't have that stock of volunteers." *Id.* at 22.

To illustrate further, in Petitioners' Opposition to Respondents' Petition and Motion to Dismiss, the Objectors note that at the August 19, 2004 pre-trial conference, Candidates' counsel requested a delay of "several weeks," which was denied because "time was of the essence." At the same conference, the court granted Candidates' counsel's request that the hearings not begin on September 1, 2004, because he had another court appearance in another matter scheduled that day, and directed, instead, that the hearing commence on September 2, 2004. From August 23–27, 2004, the Objectors note that

Candidates' counsel acknowledged that he was before a District Justice on August 23, 2004, in the morning and a Common Pleas judge in Chester County in the afternoon, arguing the constitutionality of the driving under the influence legislation. On August 24, 2004, he was in Columbia County Court of Common Pleas in a criminal case; on August 25, 2004, he was in Montgomery County Court of Common Pleas in a criminal case; on August 26,2004, he was in Adams County Court of Common Pleas in the morning on a criminal case. During the week of August 30–September 3, 2004, Objectors noted that counsel may be required to conduct two federal trials. RR at A–190. President Judge Colins noted that he called Judge McVerry of the United States District Court for the Western District of Pennsylvania "to free you from those commitments." Transcript at 5.

## DISCUSSION

### Standard of Review

This Court may reverse a Commonwealth Court's order concerning the validity of challenges to a nomination petition only if the Commonwealth Court's findings of fact are not supported by substantial evidence in the record, there was an abuse of discretion, or there was an error of law. *See Flaherty*, 770 A.2d at 331. Moreover, in reviewing election issues, we must consider the longstanding and overriding policy in our Commonwealth to protect the elective franchise. *See Weiskerger's Appeal*, 447 Pa. 418, 290 A.2d 108, 109 (1972). In promoting that policy, this Court has made clear that the Election Code must "be liberally construed in order to protect a candidate's right to run for office and the voters' right to elect the candidate of their choice." *Flaherty*, 770 A.2d at 331. Furthermore, nomination petitions are presumed to be valid and an objector has the burden of proving that a nomination petition is invalid. *See* Section 927 of the Election Code, 25 P.S. § 2937; *In re Nomination Petition of Joseph Driscoll*, 577 Pa. 501, 847 A.2d 44, 49 (2004).

## I. *The Statute*

■ We turn to the first prong of the Commonwealth Court's decision, which held that the Candidates are disqualified from appearing on the Pennsylvania General Election ballot because their Nomination Papers failed to comply with Section 951(e) of the Election Code, as a result of their nomination by the National Convention of the Reform Party of the United States and concomitant appearance on the Michigan ballot as Candidates for President and Vice President.

For the reasons that follow, we conclude that the Commonwealth Court committed an error of law when it held that this provision of the Election Code prohibits these Candidates from appearing on the ballot.

Section 951 of the Election Code provides:

(e) There shall be appended to each Nomination Paper offered for filing an affidavit of each candidate nominated therein, stating—(1) the election district in which he resides; (2) the name of the office for which he consents to be a candidate; (3) that he is eligible for such office; (4) that he will not knowingly violate any provision of this act, or of any law regulating and limiting election expenses, and prohibiting corrupt practices in connection therewith; (5) **that his name has not been presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor has he been nominated by any other Nomination Paper filed for any such office;** (6) that in the case where he is a candidate for election at a general or municipal election, he was not a registered and enrolled member of a party thirty (30) days before the primary held prior to the general or municipal election in that same year; (7) that, in the case where he is a candidate for election at a special election, he is not a registered and enrolled member of a party.

25 P.S. § 2911(e) (emphasis added).

Similarly, Section 976 of the Election Code provides, in relevant part that:

No nomination petition, nomination papers or nomination certificate shall be permitted to be filed if—... (e) in the case of nomination papers, if the candidate named therein has filed a nomination petition for any public office for the ensuing primary, or has been nominated for any such office by nomination paper previously filed

. . .

25 P.S. § 2936 (emphasis added).

Candidates argue that these provisions, often referred to as the "sore loser" provisions, are intended to refer only to candidates who run in Pennsylvania primaries and in Pennsylvania elections and do not address activities of the Candidates in other states, such as Michigan. Because the Candidates did not run in the Pennsylvania primary, and, perforce, did not lose any such primary election here, they contend that they do not meet the ban set forth in the statute. They further argue that as applied to them, it violates their First Amendment rights of association and Fourteenth Amendment rights to equal protection under the law to run in Pennsylvania as independent candidates, regardless of their nomination as candidates of the Reform Party and ballot position outside of Pennsylvania.[12]

We are mindful of the unusual factual predicate involved in the case before us and that neither the parties nor the Commonwealth Court have cited any case that is analogous to the one *sub judice*, i.e., one where a state law has been applied to prohibit a candidate nominated by a different party in a different state from running for office in the state imposing the restriction.

The Commonwealth Court erred in determining that the language of the Statute clearly addressed the instant situation. The words in the Statute do not support this conclusion. Although an argument can be made that the language applies only to candidates in Pennsylvania, because the Statute lacks

12. It is not necessary for us to address the equal protection claim because we agree that the statute, as applied to Candidates, deprives them of their First Amendment associational rights, in the absence of any showing of state interest regarding their out-of-state nomination by the Reform Party.

any narrowing language, it is equally arguable that it could apply to candidates outside the confines of the Commonwealth, as well. Because the words are ambiguous, we cannot resolve the instant issue on the basis of the statute's language. Therefore, we must turn to the Candidates' constitutional claim.

We find the Commonwealth Court's reliance on *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997), to be misplaced, because the United States Supreme Court did not answer in that case the question that we confront today. In *Timmons*, a Minnesota election code provision prohibited an individual from appearing on the ballot as the candidate of more than one party.[13] The New Party chose Andy Dawkins (Dawkins) as its candidate for State Representative. Dawkins was already the candidate of another party in Minnesota for that same office. The New Party sued state election officials, claiming that the "anti-fusion"[14] law violated its associational rights, and the Supreme Court rejected this contention. The Court stated that "[t]he First Amendment protects the rights of citizens to associate and form political parties ..." while it affirmed that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Timmons*, 520 U.S. at 357–58, 117 S.Ct. 1364 (quoting *Storer v. Brown*, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974)). Although the statute prohibited the New Party candidate from appearing on the ballot as the nominee of two different parties, the Court noted that the New Party was still free to convince Dawkins to be its candidate rather than the other party's, and Dawkins would appear on the ballot regardless. Therefore, the Court in *Timmons* found

13. The statute provided that "[n]o individual who seeks nomination for any partisan or nonpartisan office at a primary shall be nominated for the same office by nominating petition...." Minn.Stat. § 204B.04, subd. 2. Further, the statute required that a candidate have "no other affidavit on file as a candidate for any office at the same primary or next ensuing general election." *Id.* at § 204B.06, subd. 1(a)(2).

14. Most states ban multiple party, or "fusion," candidates from elected office. *Timmons*, 520 U.S. at 353, 117 S.Ct. 1364.

that the burden on the New Party's rights was not severe. This is inapposite to the instant matter, for two parties are not vying for the placement of Nader and Camejo on the ballot, and, if they do not appear as independent candidates, they will not appear on the ballot in Pennsylvania.

The Court in *Timmons* adopted its earlier analysis in *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), with respect to the test that must be applied in deciding whether a state election law violates First and Fourteenth Amendment associational rights. In *Anderson,* the United States Supreme Court found that Ohio's early filing deadline for independent candidates for President placed an unconstitutional burden on the voting and associational rights of independent candidate Anderson's supporters. The Court noted that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights," which included the right of individuals to associate to advance political beliefs and the right of qualified voters to cast their votes, rights that "rank among our most precious freedoms." *Id.* at 786–87, 103 S.Ct. 1564 (footnote omitted). In resolving constitutional challenges regarding whether a state election law violates First and Fourteenth Amendment associational rights, the Court noted that:

[i]t must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

*Id.* at 789, 103 S.Ct. 1564.

We note that in *Anderson,* the state argued three separate interests to justify its statutory early filing provision: (1)

voter education; (2) equal treatment of all candidates (the independent candidate and the candidate participating in a primary declared their candidacy on the same date); and (3) political stability. *Id.* at 796–806, 103 S.Ct. 1564. The Supreme Court rejected all of them, finding that none constituted a legitimate interest on the part of the state to justify the early filing deadline. "[E]ven when pursuing a legitimate interest, a State may not choose means that unnecessarily restrict constitutionally protected liberty." *Id.* at 806, 103 S.Ct. 1564.

In the matter before us, the Commonwealth has not intervened or appeared, and, therefore, has not offered any reason, let alone one that is "compelling," to justify its interest in prohibiting Candidates who have been nominated by the Reform Party in other states from running as independents in this Commonwealth. "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined." *Williams v. Rhodes,* 393 U.S. 23, 31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968) (internal citations and footnote omitted).[15] The Commonwealth Court's references to other cases describing state interests regarding various restrictive provisions in the Election Code cannot substitute for the requirement that where a precious freedom such as voting is involved, a compelling state interest must be demonstrated. This is certainly paramount given that the application of Section 951(e) here completely precludes Candidates from running for national office in Pennsylvania:

[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest. For the President and the Vice President of the United

---

**15.** This case involved an equal protection challenge to election laws that made it virtually impossible for a new or small party to be placed on the state ballot to choose electors for the candidates of President and Vice President. A new party was required to obtain petitions signed by fifteen percent (15%) of the number of ballots in the last election, whereas the Republican and Democratic parties were required to obtain only ten percent (10%).

States are the only elected officials who represent all of the voters in the Nation. . . . Thus in a presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders.

*Anderson,* 460 U.S. at 794–95, 103 S.Ct. 1564.

Due to the complete absence of any evidence with respect to the state's interest here, we hold that the Commonwealth Court erred in applying Section 951(e) to disqualify the Candidates from running as independents in Pennsylvania because of their nomination by the Reform Party, in Michigan, and other states.

▮ Objectors further allege that, pursuant to Section 951.1, Camejo is ineligible to be a candidate in Pennsylvania because of his membership in the Green Party in California. Further, they contend that because of Camejo's failure to disclose his party membership in his signed Affidavit, he is disqualified from appearing on the ballot as an Independent Political Body. Candidates argue that, in the same way Section 951(e) of the Election Code was unconstitutionally applied to them, Section 951.1 was also unconstitutionally applied to Camejo because it violated their rights, as well as the rights of voters and parties, under the First and Fourteenth Amendments.[16] The Commonwealth Court disqualified Camejo, finding that Section 951.1 applied to him.

Referring to our earlier recitation of the standard of review, *supra* p. 38–40, 858 A.2d p. 1177, and level of scrutiny applied to constitutional challenges alleging First Amendment violations, *supra* p. 42–43, 858 A.2d p. 1179, we reverse the

**16.** This Section states in relevant part:

Any person who is a registered and enrolled member of a party during any period of time beginning with thirty (30) days before the primary and extending through the general or municipal election of that same year shall be ineligible to be the candidate of a political body in a general or municipal election held in that same year nor shall any person who is a registered and enrolled member of a party be eligible to be the candidate of a political body for a special election.

25 P.S. § 2911.1.

determination of the Commonwealth Court. The Commonwealth has not intervened, thus failing to supply any reason, compelling or otherwise, to justify its interest in prohibiting candidates who are members of a party in another state from running as independents in this Commonwealth. We opine that, where the fundamental right to vote is at issue, a strong state interest must be demonstrated. Instead, we find that Section 951.1 was wrongfully applied to Camejo, it is not necessary for us to address Objectors' argument that the fact that Camejo failed to disclose his membership should disqualify him.

 Candidates' further aver that Section 951.1 violates the Equal Protection Clause of the Fourteenth Amendment because they, as independent political bodies, are required to file Affidavits where candidates running as nominees of political parties are not.[17] However, Candidates' insufficiently present this argument. They cite no authority supporting their position. Rather, they merely make the assertion without providing any support for it. Further, the United States Supreme Court has stated that where there had been an allegation that an election code provision violated the Equal Protection Clause of the United States Constitution, "the Equal Protection Clause allows States considerable leeway to enact legislation that may appear to affect similarly situated people differently. Legislatures are ordinarily assumed to have acted constitutionally." *Clements v. Fashing*, 457 U.S. 957, 962, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982). Candidates efforts fall short of establishing that this leeway was contravened.[18]

17. *See* Section 910 of the Election Code.

18. Candidates made another argument regarding the application of the provisions of the Election Code to prohibit their appearing on the ballot. They argue to this Court that Section 951 of the Election Code should be applied not to Camejo, but only "to the 21 presidential electors, who are the nominated Pennsylvania candidates, all of whom are registered independent or unaffiliated in Pennsylvania[ ]." Brief of Appellants at 4–5. Candidates did not include this issue in their Brief in Support of the Motion to Dismiss Objectors' Challenges, and it is waived. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).

## II. *The Procedural Objections*

 Because we have determined that the Commonwealth Court erred in applying the relevant portions of the Election Code to Candidates, we must now address the issue of the signatures. As a preliminary matter, we note that Candidates assert that we need not review these procedural objections because the Opinions of this Court, upon which the objections are based, are unconstitutional. However, Candidates fail to offer sufficient support for their bald allegations. Candidates' repeatedly argue that in order to avoid a First Amendment violation, a lesser standard of review must be applied to them because they are running for a nationally elected position. This allegation is unpersuasive. Simply asserting that a particular regulation will restrict ballot access does not amount to a violation of the First Amendment right to free association.

## A. *The Late Registrations*

 Candidates argue that because the registration process can take several days, persons who signed and mailed in registration cards during the circulation period may not have appeared on the registration list, yet may have been properly registered. At the hearing, Candidates' counsel testified that of the 1,371 signatures reviewed, the number of late signatures was fifty-two, or four percent (4%). The Commonwealth Court held that delivery to an appropriate registration official is required and that only an elector who has delivered a completed application to registration officials or has postmarked the application on or before the date of signing the petition is a "qualified elector" pursuant to Section 951 of the Election Code.

 Section 951(c) of the Election Code, 25 P.S. 2911(c), provides, *inter alia,* that "each person signing a nomination paper shall declare therein that he is a qualified elector of the State or district, as the case may be. . . . " The Commonwealth Court held that "an elector who has either delivered a completed application to registration officials or has postmarked that application on or before the date of signing the petition is

a 'qualified elector' under Section 951 of the Election Code."
Commonwealth Court Opinion dated August 30, 2004, at 10.
Accordingly, the only individuals who may validly sign Nomi-
nation Papers are those who (1) previously registered to vote;
or (2) delivered their completed application to election officials
the same day that they signed the Nomination Papers; or (3)
postmarked their completed application the same day that
they signed the Nomination Papers. Candidates argue that
striking the signatures of Pennsylvania voters who registered
to vote after signing Nader's Nomination Papers is unconstitu-
tionally burdensome and overbroad. Yet, Candidates present
no precedent to support their position. They fail to present
the standards for determining if such a requirement is either
burdensome or overly broad. Without this minimum showing,
we cannot entertain such an argument. Further, we agree
with the Commonwealth Court's determination that transmit-
tal of a registration application is necessary to effectuate
registration. The requirement that the signing of Nomination
Papers occur after or simultaneous with voter registration
serves the compelling governmental interest of ensuring that
only qualified electors participate in the nomination process.
Accordingly, we agree with the Commonwealth Court that the
signature of any individual whose application was delivered or
postmarked after the day that he or she signed the Nomina-
tion Papers must be stricken.

### B. *The Stringent Signature Requirements*

 Candidates next challenge the application of the strin-
gent signature requirements that this Court has upheld in
recent cases. In *In re Nomination Petition of Silcox,* 543 Pa.
647, 674 A.2d 224 (1996), we held that an elector who signs a
nomination petition must personally write his occupation, place
of residence and date on the petition. Candidates aver that
"[t]raditionally, the name was signed by the person, but the
circulator would often fill in the rest of the information."
Brief of Appellant at 44. Although we recognized that the
Election Code must be construed liberally, we noted that
Section 908 of the Election Code, 25 P.S. § 2868, provides in

relevant part that each elector "**shall add** his residence, giving city, borough or township, with street and number, if any, and **shall also add** the date of signing, expressed in words or numbers . . . ." 25 P.S. § 2868 (emphasis added). Based on the plain meaning of the statute we affirmed the Order of the Commonwealth Court that struck the candidate's nomination petition. In *In re Nomination Petition of Flaherty,* 564 Pa. 671, 770 A.2d 327 (2001), we struck printed names on a nominating petition that did not match the electors' signature on their voter registration cards, struck signatures where the electors' addresses did not match the address on their voter registration cards, and struck signatures where the circulator was not present when each elector signed. We noted that "[e]lectors are required to sign their name to a candidate's nomination petition as a means of preventing forgery and assuring that each elector personally signs the petition with an understanding of what he is signing." *Id.* at 332. We further stated:

> A person's name as signed is perceived to be an insignia used by that person to represent herself and generally is made in a manner that is not easily traceable, as in the case of the person's printed name. Given this difference, as well as the importance of insuring the integrity of the election process, we find that in stating that a person must "sign" the nomination petition, the General Assembly intended that a person make that insignia that the person uses to represent herself, rather than print her name.

*Id.* at 333. With regard to the requirement that the elector's address on the petition match the address on the voter registration card, we held that absent extraordinary circumstances, an individual who signs a nomination petition that lists an address other than the one provided on his voter registration card is not a qualified elector. We also abrogated prior case law, including *In re Nomination Petition of Martin,* 435 Pa. 446, 257 A.2d 247 (1969), and held that a circulator must be present to witness the signing of a nomination petition.

The Candidates suggest that the impact of these decisions on collecting signatures for Nomination Papers for a national election is onerous, and point to the fact that in this case, 25,697 signatures are required for ballot access. They aver that the signature requirements set forth in *Silcox* and *Flaherty* unduly burden ballot access in violation of the Federal Voting Rights Act (Federal Voting Law) and the First and Fourteenth Amendments. The Candidates' note that the Federal Voting Law provides:

No person acting under color of law **shall deny the right of any individual to vote** in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election . . .

42 U.S.C. § 1971(a)(2)(B) (emphasis added). Reliance on this section of the Voting Rights Act is misplaced because *Silcox* and *Flaherty* do not concern the right of an individual to vote. Rather, they explain the steps that a candidate must take in order to be properly placed on a ballot.

The Candidates further assert that the signature requirements impact upon their First and Fourteenth Amendment rights to association. They urge this Court to decline to apply our recent holdings interpreting the signature requirements of the Election Code. Candidates point out that while they need to gather more than 25,000 signatures, a candidate running for the Pennsylvania Senate needs to gather only 500 signatures. They argue that the signature requirements, although strict, are not burdensome when a candidate is running for a state position, but rise to the level of being too burdensome when, as here, more than 25,000 are required. They fail to note that they can request signature support from every registered voter of the Commonwealth while trying to gain the necessary signatures, while those running for a state office may gather only signatures of registered voters within their district. Instead of providing any support for their contention, Candidates merely repeat that our current case law imposes an

onerous burden. They fail to provide, and we likewise fail to find, any authority holding that such signature requirements are unconstitutional.

Further, as noted by the Commonwealth Court, establishing a lesser standard for the Candidates likely implicates significant equal protection issues. *See* Commonwealth Court Opinion dated August 30, 2004, at 8. We cannot justify applying one set of standards to the Candidates and more exacting requirements to all other persons seeking ballot access. We believe that Candidates have done nothing more than baldly assert a violation of their First Amendments rights in an attempt to secure relief on a claim lacking validity. Because we find their claim utterly lacking merit, we decline to engage in a substantive analysis of their allegations of ballot access violations.

## C. *The Signatures Struck by the Secretary*

Candidates assert that the Commonwealth Court erred by denying them relief on their claim that the action of the Secretary of the Commonwealth in striking 4,936 signatures from their Nomination Papers without providing them with notice was a violation of due process. Section 976 of the Election Code, 25 P.S. § 2936, authorizes the Secretary of the Commonwealth to disregard any signature that appears not to be genuine when determining if the Nomination Papers contain the sufficient number of signatures. Significantly, although the Secretary rejected 4,936 signatures, he accepted the Candidates' Nomination Papers because he concluded that 25,697 signatures appeared facially valid. Reply to the Order of Court filed by Secretary of the Commonwealth, August 24, 2004, at 2. In light of the acceptance of the Nomination Papers, the actions of the Secretary did not directly harm the Candidates. Had the Secretary rejected the Nomination Papers, the Candidates would clearly have been entitled to seek judicial relief. Section 976 of the Election Code provides that a refusal of the Secretary to receive and file a Nomination Papers may be reviewed by the court upon an application to compel its acceptance as of the date when it was presented.

Where, as here, the Secretary accepts Nomination Papers, the Commonwealth Court recognized the potential for signatures stricken by the Secretary to become a deciding factor in a later objection hearing. When this occurs, the court recognized that bringing a mandamus petition to reinstate the stricken signatures may not be practical due to time constraints. Instead, it approved the approach taken by the Objectors, who included the signatures already rejected by the Secretary in their Objections to the Nomination Papers.[19] Because the Objectors utilized this procedure, the Candidates had notice of the stricken signatures, and the Objectors assumed the Secretary's burden to prove the invalidity of the signatures.

The Candidates assert that the fact that the Commonwealth Court suggested the possibility of seeking relief in mandamus indicates that it unfairly placed the burden on them to challenge the Secretary's decision. They note that mandamus was not a possible remedy because the Secretary failed to advise them of his actions in a timely manner. However, the court recognized that the procedure employed in the instant matter, whereby the Objectors incorporated into their Objections the signatures stricken by the Secretary and gave notice to the Candidates of the identity of the signatures and the basis for the challenges, was sufficient to meet the requirements of due process. The Candidates correctly note that a fundamental requirement of procedural due process is the opportunity to be heard at a meaningful time and in a meaningful manner. *Armstrong v. Manzo*, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). Here, the procedure that was used, and approved, by the court provided for the Candidates to be advised of the signatures that the Secretary had rejected, thereby giving them an opportunity to rebut the arguments and evidence presented by the Objectors in support of the Secretary's

---

**19.** Counsel for the Objectors stated that "[o]ur position on those strikes is that we have incorporated by reference in our petition to set aside the Secretary's strikes, and we will prove those strikes.... We have incorporated the fact that the Secretary did it as giving notice to the other side that we intend to pursue that objection, but the burden is on the objectors to prove that." Transcript at 83.

striking of the signatures. Accordingly, the requirements of due process were met in this matter.

## CONCLUSION

The Commonwealth Court erred by applying Section 951 to the Candidates to preclude their appearance on the ballot in Pennsylvania for the offices of President and Vice President on November 2, 2004. While we acknowledge the complexity of the task of striking a balance between the associational rights of citizens under the First Amendment to form political parties and the practical need and right of the state to regulate elections, there has been no state interest asserted or proved to justify excluding Candidates from our ballot as an Independent Political Body merely because they have been nominated by the Reform Party in other states.

The Commonwealth Court identified the correct standards that we have mandated in *Flaherty* and *Silcox*, regarding late registrations and the requirements for review of signatures and addresses. Further, Candidates' due process rights were not violated by the Secretary's rejection of signatures. Candidates' request for application of lesser standards may well portend their inability to meet the requirements we have established.

The Commonwealth Court stood ready to commit every conceivable resource toward resolving the question of contested signatures in a way that would respect the deadlines and realities of the impending election. For example, the court involved the Philadelphia County Board of Elections and the Allegheny County Election Board to ensure that the parties had access to their records, including on weekends, immediately remedied a problem that arose with computer terminal access in Pittsburgh, committed four commissioned judges of the Commonwealth Court and one senior judge to work on nothing else but the instant case, until concluded, cancelled arguments in other of its cases in Harrisburg, arranged to have court employees work at night and on weekends, and delayed major proceedings and overdue opinions. These are

extraordinary arrangements, put in place to accommodate a significant challenge.

The court was ready to proceed, and the Objectors, who have the burden of establishing the invalidity of the signatures that they challenged, claim they are ready to proceed. We note that throughout oral argument on August 27, 2004, Candidates' counsel repeatedly requested more time, and alleged that if trial had been set for October 1, 2004, "by September 29 I would be in a position to say, Yes, we are proceeding or no, we are not." Transcript at 35. Because more than three weeks have elapsed, it is reasonable to expect Candidates' counsel to be prepared to go forward with this matter.

The Commonwealth Court, nevertheless, did not review any signatures, despite the accommodations it made, because of Candidates' inability to comply with the court's procedures and commit the resources necessary for the task. Recognizing the approach of the November 2, 2004 General Election, we reverse the Order of the Commonwealth Court, deny the Request for Supersedeas requested by Candidates, and remand the matter for expedited hearings, applying the standards set forth by this Court, regarding the validity of the signatures.

Chief Justice CAPPY files a Concurring Opinion, joined by Justice CASTILLE who also joins the Majority Opinion, and Justice NIGRO.

Justice SAYLOR files a Concurring Opinion.

Chief Justice CAPPY Concurring.

I join the majority opinion, and in particular Part II, regarding the procedural objections that Ralph Nader ("Nader") and Peter Miguel Camejo ("Camejo") (collectively, the "Candidates") raised. I also agree with Part I of the majority opinion that Section 951(e) and Section 951.1 of Pennsylvania's Election Code, 25 P.S. §§ 2911(e), 2911.1, do not disqualify Nader or Camejo from appearing on the Pennsylvania General Election ballot. I write separately to set forth an alternative

rationale for this conclusion, which is based on statutory construction. More specifically, I conclude that the General Assembly did not intend for Sections 951(e) and 951.1 presently to apply.[1]

I am guided by the following principles. Under the Statutory Construction Act, the object of all statutory construction is to ascertain and effectuate the General Assembly's intention. 1 Pa.C.S. § 1921(a). Every statute is to be construed, if possible, to give effect to all of its provisions. *Id.* When the words of a statute are clear and free from ambiguity, the letter of the statute is not to be disregarded under the pretext of pursuing its spirit. 1 Pa.C.S. § 1921(b). When, however, the words of a statute are not explicit, the General Assembly's intent may be ascertained by considering a variety of factors, which include the occasion and necessity for the statute; the circumstances of its enactment; the mischief it remedies; the object it attains; and the consequences of a particular interpretation. 1 Pa.C.S. § 1921(c). Moreover, it may be presumed that the General Assembly does not intend to violate the United States or Pennsylvania Constitutions; does not intend an absurd or unreasonable result or one impossible of execution; and that it intends the entire statute to be effective and certain. 1 Pa.C.S. § 1922(1)–(3). Finally, the Election Code is to be liberally construed so as not to deprive the voters of their right to elect a candidate of their choice or an individual of his right to run for office. *In re Silcox,* 543 Pa. 647, 674 A.2d 224, 225 (1996).

I turn first to Section 951(e).[2] In my view, this provision is not explicit as to whether it applies to a person, like Nader or Camejo, who seeks to appear on the ballot in this Commonwealth as an independent candidate for a national office, but who has been nominated by a party for that office in another state. While some of the words in the provision at issue are

1. Because I would resolve the issues relating to Sections 951(e) and 951.1 on a statutory construction basis, I would not reach the constitutional arguments raised in connection therewith.

2. As noted on page 18 of the majority opinion, Section 976 of the Election Code, 25 P.S. § 2936, reflects Section 951(e)'s requirements.

broad and all-inclusive, certain others suggest that the legislature was not concerned with this sort of political activity beyond Pennsylvania's borders. Therefore, Section 951(e) is ambiguous. *See* 1 Pa.C.S. § 1921(b).

Thus, resort to the factors listed in 1 Pa.C.S. § 1921(c) to ascertain the General Assembly's statutory intent is in order. The purposes that Section 951(e) serves and the difficulties it aims to avert are instructive. It has been recognized that Section 951(e) prevents cross-nominations by prohibiting a candidate from appearing on the ballot as the candidate of more than one political group, *see Patriot Party of Allegheny County v. Allegheny County Dept. of Elections*, 95 F.3d 253, 256 (3d Cir.1996), and prevents the election ballot from being cluttered by candidates who hope to multiply the number of times their name appears on the ballot under various labels. *Packrall v. Quail*, 411 Pa. 555, 192 A.2d 704, 706 (1963).[3]

In this case, however, these purposes and aims of Section 951(e) are not implicated. That is, despite Nader's and Camejo's nomination in Michigan by the Reform Party and their concomitant appearance on the Michigan ballot as candidates for President and Vice President, under the nomination papers they have filed in the Commonwealth, their respective names will appear only once on the Pennsylvania ballot in connection with the November 2004 General Election as independent political body candidates for these offices. Thus, I do not believe that the General Assembly intended that Section 951(e) apply to the Candidates before us.

Moreover, inasmuch as this analysis of the legislatures intent in Section 951(e) avoids any infringement upon the Candidates constitutional rights, it is consistent with the pre-

---

**3.** Section 951(e) also prevents a loser in a primary from running in the general election as an independent or another party's candidate. *See In re Zulick*, 832 A.2d 572 (Pa.Cmwlth.2003), *aff'd*, 575 Pa. 140, 834 A.2d 1126 (2003). This statutory purpose is not relevant. It is because the Candidates filed nomination papers in Pennsylvania as candidates of a independent political body for the offices of President and Vice President in the November 2004 General Election and are simultaneously running as candidates for these same offices in Michigan by nomination of the Reform Party that Section 951(e) was raised by the Objectors.

sumption that the General Assembly intends constitutional enactments, *see* 1 Pa.C.S. § 1922(3), and insofar as it upholds access to the ballot, it is mindful of the liberal construction that election laws are to be given. *See In re Silcox*, 674 A.2d at 225.

I likewise conclude that Section 951.1, 25 Pa.C.S. § 2911.1, under which the Commonwealth Court ruled that Camejo cannot appear on the ballot as the candidate of a political body because of his membership in the (minor) Green Party, is inapplicable. I believe that the language of this provision, which includes "thirty (30) days before the primary ...." as its reference point of disaffiliation, when read in context, clearly reveals that the General Assembly intended it to apply to major, not minor, political parties. This is so because in the Election Code, the legislature has determined that only major parties may gain ballot access through the primary process. *See Heicklen v. Pennsylvania Board of Elections*, 751 A.2d 260, 262 (Pa.Cmwlth.), *aff'd per curiam*, 561 Pa. 33, 747 A.2d 894 (2000)(holding that 25 Pa.C.S. § 2872.2 is capable of only one meaning; that minor political parties must nominate candidates by nomination papers and are not entitled to participate at party primaries.)

Further, even if Camejo's affidavit were deemed to be false in this regard, I do not believe that his name should have been removed from the ballot on this basis. In *State Ethics Comm'n v. Baldwin*, 498 Pa. 255, 445 A.2d 1208 (1982), we tempered our holding in *In re Nomination Petition of Cianfrani*, 467 Pa. 491, 359 A.2d 383 (1976), and explained that before an affidavit may be declared void and invalid because it contains false information, there must be evidence that the candidate knowingly falsified the affidavit with the intent to deceive the electorate. *Baldwin*, 445 A.2d at 1211–12. As the record revealed no intent to deceive on Camejo's part, there was no reason to disqualify him from ballot status based on statements he made in his affidavit.

Accordingly, I join the majority in reversing the Order of the Commonwealth Court dated August 30, 2004, and remanding this case to the Commonwealth Court for expedited hear-

ings on the Petition to Set Aside the Nomination Papers of Ralph Nader and Peter Miguel Camejo.

Justice CASTILLE and NIGRO join this concurring opinion.

Justice SAYLOR Concurring.

Although I am in substantial alignment with the majority's disposition, like Mr. Chief Justice Cappy, I would apply a different analysis centered on statutory interpretation, rather than constitutional infirmity.

As recited by the majority, pursuant to Section 951 of the Election Code, to appear on the ballot as an independent candidate an individual must submit "nomination papers" reciting, *inter alia*, that he has not been "presented as a candidate by nomination petitions for any public office to be voted for at the ensuing primary election, nor has he been nominated by any other nomination papers filed for any such office[.]" 25 P.S. § 2911(e)(5). I acknowledge that, in the abstract, this language could be read to suggest a cross-jurisdictional, anti-fusion proscription, which might raise the sorts of constitutional concerns that the majority undertakes to evaluate. A closer examination reveals, however, that the designated, operative terms "nominating papers" and "nominating petitions" pertain exclusively to Pennsylvania-specific submissions, *i.e.*, documents that are "in form prescribed by the Secretary of the Commonwealth." *Id.*, §§ 2911(a), 2867. *See generally In re Bedow*, 848 A.2d 1034, 1037 (Pa.Cmwlth. 2004). It seems clear, then, that the General Assembly intended the prohibition here at issue to apply to individuals who have been otherwise nominated in Pennsylvania, as it would be unreasonable to assume that Pennsylvania election forms are used for election purposes in other states. Thus, by its terms, Section 951 simply does not have an extraterritorial focus or application.

A similar analysis pertains to the statutory disaffiliation provision grounding Appellees' distinct challenge to Mr. Camejo's candidacy based upon his ongoing affiliation with the

California Green Party. Although Section 951.1 of the Election Code specifies that any individual who was a member of a "political party" during the relevant time period is excluded as a candidate of a political body, *see* 25 P.S. § 2911.1, for purposes of this provision a political party is defined with reference to political bodies that received certain minimum threshold vote levels in Pennsylvania in the prior general election. *See* 25 P.S. § 2831 (defining "political party" and "political body"); *see also* 25 P.S. § 2602(n, p) (specifying that the terms "political party" and "political body" are defined, for purposes of the Election Code, as set forth in section 801 of the Code, i.e., 25 P.S. § 2831). Thus, it seems evident that the General Assembly intended the exclusion at issue to apply only to members of organizations considered "political parties" according to these in-state standards.[1]

Here, although Appellees equate the California Green Party with the Pennsylvania Green Party, they do not develop the specific grounds for such direct association. In such circumstances, it is questionable whether Mr. Camejo's candidacy is in tension with Section 951.1 in the first instance; therefore, I would include within the scope of the remand a directive to the Commonwealth Court to undertake the necessary fact finding, particularly as this may obviate the constitutional question. addressed by the majority. *See generally Commonwealth v. Failor*, 564 Pa. 642, 646–47 n. 5, 770 A.2d 310, 312 n. 5 (2001); *Cheek v. United States*, 498 U.S. 192, 203, 111 S.Ct. 604, 611, 112 L.Ed.2d 617 (1991).[2]

1. I do not concur in the Chief Justice's reasoning that, because only major political parties may hold primaries, and the beginning of the requisite time period for disaffiliation under Section 951.1 begins 30 days before the primary, *see* 25 P.S. § 2911.1, it necessarily follows that the Legislature only intended the disaffiliation requirement to apply to major parties in the first instance. Because, as noted, the term "party" is defined by the Election Code, and the definition includes both major and minor parties, I see no reason to interpret that term more narrowly for purposes of Section 951.1 simply because the relevant time period is defined by reference to the date on which the primary election is held.

2. I also distance myself from the majority's substantive, constitutional analysis on this point, particularly as it does not address the United States Supreme Court's approval of a similar political disaffiliation

In summary, I would reverse the Commonwealth Court's order as to Mr. Nader on the basis that the relevant provision of the Election Code, 25 P.S. § 9711(e), was not intended to impose constraints relative to individuals who are nominated by political parties in other states in a national election, and remand for additional fact finding in relation to the Section 951.1 challenge to Mr. Camejo's candidacy.[3]

I also support the majority's decision to direct the initiation of the signature-review process in the Commonwealth Court—as it may be controlling, and further delay could yield undesirable consequences—and to conditionally restore ballot access to Messrs. Nader and Camejo, based upon the relevant presumption of validity attaching to the nomination papers, as well as the public policy favoring ballot access.

statute in *Storer v. Brown,* 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), cited by Appellees.

3. In this regard, I also believe that the candidate's motivation in conjunction with the material omission, if any, is a question of fact to be assessed, in the first instance, by the Commonwealth Court, as fact finder. While the Chief Justice adverts to the lack of any record evidence of bad faith, there was no hearing on the issue, and hence, no opportunity for the objectors to prove their averment that Mr. Camejo engaged in false swearing when he executed his affidavit. *See* RR. 57a.