BLANKENSHIP ET AL. *v.* BLACKWELL, SECY. OF STATE, ET AL.

[Cite as *Blankenship v. Blackwell,* 103
Ohio St.3d 567, 2004-Ohio-5596.]

(No. 2004–1652—Submitted October 19, 2004—Decided October 22, 2004.)

**Per Curiam.**

{¶ 1} At issue in this case is relators' entitlement to a writ of mandamus to compel the Secretary of State of Ohio to order boards of elections to update their voter-registration records and conduct a second review of the validity of a nominating petition seeking the placement of Ralph Nader and Miguel Camejo as independent candidates for President and Vice–President of the United States on the November 2, 2004 general election ballot in Ohio. For the following reasons, we deny the writ based on laches and relators' failure to comply with R.C. 2731.04.

{¶ 2} Relators, Herman Blankenship, Kim Blankenship, Julie Coyle, Logan Martinez, and Larry Snider, are Ohio residents who are members of a committee representing Ralph Nader and Miguel Camejo. On August 18, 2004, relators submitted to respondent Secretary of State J. Kenneth Blackwell a joint statement of candidacy and nominating petition requesting that Nader and Jan D. Pierce be independent candidates for President and Vice–President of the United States at Ohio's November 2, 2004 general election. Later on August 18, relators submitted to the Secretary of State Pierce's withdrawal as the vice-presidential nominee, the committee's appointment of Camejo to fill the vacancy, and Camejo's acceptance of the appointment.

{¶ 3} The petition consisted of part-petitions exhibiting 14,473 signatures. In order to have their names placed on the Ohio ballot, Nader and Camejo were required to have their nominating petitions "signed by no less than five thousand qualified electors." R.C. 3513.257(A).

{¶ 4} Pursuant to R.C. 3513.263, the Secretary of State transmitted relators' petition papers to the appropriate county boards of elections to examine and determine the sufficiency of the signatures and the validity of the petition papers. The Secretary of State instructed the boards of elections to report their findings by September 3. The boards of elections determined that 6,464 signatures on the

part-petitions were valid. It is uncontradicted that the boards of elections reviewed all of the 14,473 petition signatures except those signatures on part-petitions that were completely invalidated by circulator misconduct. See, e.g., R.C. 3501.38(F) ("If a circulator knowingly permits an unqualified person to sign a petition paper or permits a person to write a name other than the person's own on a petition paper, that petition paper is invalid * * *").

{¶ 5} On August 30, 2004, Ohio electors Benson A. Wolman, Jerilyn L. Wolman, Zachery E. Manifold, Julia E. Manifold, Bassel Korker, Rebecca S. Mosher, Barry C. Keenan, Gerald L. Robinson, Scott Austin, Mary C. Woods, Johnathon Brunner, Max Kravitz, and Daniel T. Kobil filed a written protest against the petition challenging the validity of many of the remaining 6,464 signatures ruled valid by the boards of elections. On August 31, 2004, the Secretary of State notified relators that a protest had been filed.

{¶ 6} On September 8, 2004, the Secretary of State concluded that based on decisions of the boards of elections, 6,464 signatures on relators' nominating petition were valid, a number exceeding the R.C. 3513.257(A) requirement of 5,000 valid signatures. On September 21, the Secretary of State preliminarily certified the petition and placed Nader and Camejo as candidates on the nominated list for the United States presidential election, subject to results from a hearing on the protest against the petition.

{¶ 7} Earlier, in August 2004, the Nader campaign had contracted with a private company to gather petition signatures in Ohio. When the campaign advised the company that it required a guaranteed signature-validity rate of 70 percent, the company informed the campaign that this rate would not necessarily be possible because of the high volume of recently submitted voter-registration applications that Ohio boards of elections still needed to process.

{¶ 8} On or about September 20, 2004, relators requested records from the Butler, Franklin, Greene, Hamilton, Lorain, Lucas, and Montgomery County Boards of Elections to identify (1) the number of unprocessed voter-registration applications on various dates, including when the boards transmitted the petition papers back to the Secretary of State, and (2) the number of part-petitions determined to be invalid for a reason related to circulator conduct and the number of signatures contained thereon that were not reviewed for validation.

{¶ 9} Regarding the voter-registration application backlog at the time of transmittal of the petition papers back to the Secretary of State, the boards of elections provided the following responses: (1) Butler County—no backlog; (2) Franklin County—no backlog; (3) Greene County—did not keep count; (4) Hamilton County—10,000 applications; (5) Lorain County—1,600 applications; (6) Lucas County—12,000 applications; and (7) Montgomery County—more than 2,500 applications.

{¶ 10} For part-petitions invalidated because of circulator-related defects, the boards of elections provided the following responses: (1) Butler County—60 part-petitions containing 701 signatures; (2) Franklin County—2 part-petitions containing 29 signatures, but 16 of those signatures were validated; (3) Greene County—3 part-petitions containing 3 signatures; (4) Hamilton County—153 part-petitions containing 935 signatures; (5) Lorain County—2 part-petitions containing 26 signatures; (6) Lucas County—5 part-petitions containing 76 signatures; and (7) Montgomery County—38 part-petitions containing 688 signatures, of which 75 signatures were reviewed for validation.

{¶ 11} From September 21 to September 24, 2004, a hearing officer for the Secretary of State conducted a hearing on the protest against relators' nominating petition. The hearing officer permitted both the protestors and relators to introduce evidence and present argument. There is no allegation or evidence that relators argued that the boards of elections had erroneously invalidated some petition signatures because of a backlog of unprocessed voter-registration applications.

{¶ 12} On September 28, 2004, the hearing officer issued a detailed memorandum recommending that 2,756 of the 6,464 petition signatures previously validated by the boards of elections and Secretary of State be deemed invalid for various reasons, including circulator misconduct. On that same date, the Secretary of State adopted his hearing officer's recommendation. Because relators' petition contained 3,708 valid signatures, a number smaller than the required minimum of 5,000, the Secretary of State ordered the boards of elections on September 28 to remove the Nader/Camejo candidacy from the presidential ballot "or to otherwise notify voters that a vote cast for the Nader/Camejo candidacy will not be counted." September 28 was also the date when county boards of elections were to have absentee ballots printed and ready for use. R.C. 3509.01.

{¶ 13} Six days later, on October 4, 2004, relators filed this expedited election case. Their complaint is a mixture of allegations and requests for relief. Nevertheless, it appears that relators request a writ of mandamus to compel the Secretary of State to order Ohio's 88 county boards of elections to (1) update their voter-registration records, (2) re-review the part-petitions based on the updated records, (3) validate previously invalidated signatures on the part-petitions that were improperly invalidated because of outdated records, and (4) review unreviewed signatures on totally invalidated part-petitions where updated records show that the circulators are duly registered voters. In addition, relators seek a writ of mandamus to compel the Secretary of State to count as valid those signatures on part-petitions that were invalidated because of the circulator-residency requirement of R.C. 3503.06. Finally, relators request a writ of mandamus to compel the Secretary of State to certify as valid Nader's candidacy

for President of the United States upon a finding, following the boards' review of updated records, that at least 1,292 signatures previously invalidated are in fact valid.

{¶ 14} Relators allege in their complaint that their focus is the 8,009 signatures invalidated by the boards of elections *before* they returned the part-petitions to the Secretary of State, rather than the additional 2,756 signatures invalidated by the Secretary of State following the protest hearing. In their complaint, relators also claimed that the residency requirement in R.C. 3503.06 and 3501.38 for circulators of nominating petitions violated petition signers' free speech rights under the First and Fourteenth Amendments to the United States Constitution. More specifically, relators' complaint challenges the R.C. 3503.06 requirement that petition circulators be residents of the state of Ohio.

{¶ 15} On October 5, 2004, the protesters filed a motion to intervene, an answer, and a motion for judgment on the pleadings. On October 6, the court granted the protesters' motion to intervene. *10/6/04 Case Announcements,* 103 Ohio St.3d 1472, 2004-Ohio-5373, 815 N.E.2d 1124. On October 8, 2004, the Secretary of State moved to dismiss. On October 15, relators filed a memorandum in response to the protesters' motion for judgment on the pleadings and the Secretary of State's motion to dismiss. Relators also moved to allow Capital University Law Professor Mark R. Brown to appear pro hac vice for them. The parties submitted evidence and briefs pursuant to S.Ct.Prac.R. X(9). No reply brief was filed.

{¶ 16} The protesters submitted affidavits establishing that despite any voter-registration application backlogs when they returned the part-petitions to the Secretary of State, the Hamilton and Montgomery County boards of elections processed all of the voter-registration applications they received from the Nader campaign with the Nader part-petitions before they reviewed the sufficiency of the Nader part-petitions. The protesters also introduced evidence that at least some of the part-petitions invalidated by the boards of elections for defects related to petition circulators were based on reasons other than unprocessed voter-registration applications, including circulator fraud.

{¶ 17} This cause is now before the court for a consideration of the merits.

## Motion to Allow Appearance Pro Hac Vice

{¶ 18} Relators, through their duly admitted Ohio counsel, move for the admission pro hac vice of Mark R. Brown, a member of the Kentucky Bar and Professor at Capital University Law School, to appear as co-counsel in this expedited-election case. We grant the motion. Relators have complied with the procedural requirements for admission pro hac vice. S.Ct.Prac.R. I(2). We routinely grant these motions in our cases, including expedited-election cases.

See *State ex rel. Moore v. Malone,* 96 Ohio St.3d 1458, 2002-Ohio-3840, 772 N.E.2d 641.

## Laches

{¶ 19} Respondents assert that relators' mandamus claims are barred by laches. We have consistently required relators in election cases to act with the utmost diligence. *State ex rel. Ditmars v. McSweeney* (2002), 94 Ohio St.3d 472, 479, 764 N.E.2d 971. "If relators do not act with the required promptness, laches may bar the action for extraordinary relief in an election-related matter." *State ex rel. Steele v. Morrissey,* 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107, ¶ 12. " 'The elements of laches are (1) unreasonable delay or lapse of time in asserting a right, (2) absence of an excuse for the delay, (3) knowledge, actual or constructive, of the injury or wrong, and (4) prejudice to the other party.' " *State ex rel. Ascani v. Stark Cty. Bd. of Elections* (1998), 83 Ohio St.3d 490, 493, 700 N.E.2d 1234, quoting *State ex rel. Polo v. Cuyahoga Cty. Bd. of Elections* (1995), 74 Ohio St.3d 143, 145, 656 N.E.2d 1277.

{¶ 20} Relators' claims are—as they concede in their complaint—confined to the decisions of the boards of elections invalidating a total of 8,009 signatures before the boards returned the part-petitions to the Secretary of State. But these decisions were completed by *September 3,* and respondents failed to raise their claim concerning the unprocessed voter-registration applications until *31 days later,* when they filed this expedited-election case on October 4.

{¶ 21} The Nader campaign knew about this claim as early as August 2004. In fact, relators readily admit that they "were cognizant that more than fifty-five percent of the originally submitted signatures were invalidated," a situation they attributed "to extensive backlog in registration data at local Boards [of Elections]." They also admit that they attempted to obtain information from the boards of elections about the purported voter-registration backlog in order to defend against the protest challenging the validity of the Nader petition.

{¶ 22} Despite this knowledge, however, relators failed to even seek information about unprocessed voter-registration applications until September 20, 2004— the eve of the protest hearing—and then did not attempt to introduce this evidence before the Secretary of State to defend against the protest. By contrast, the Nader campaign had raised a comparable claim concerning registration applications in August 2004 in Pennsylvania. See *In re Nader* (2004), —— Pa. ——, ——, 858 A.2d 1167, 1174 ("Candidates [Nader and Camejo] argued that certain later registrations should be permitted, contending that persons who sign and mail registration cards during the circulation period may be properly registered, even though they do not appear on the registration list").

{¶ 23} If relators had requested this information sooner, they may have been able to produce evidence against the protest in the hearing before the Secretary of State. By not doing so, they are relegated to complaining that by the time the boards of elections provided responses to their September 20 requests, "the Hearing [before the Secretary of State] was already in progress." They should have expected this result when they waited until the day before the hearing to request information about their claim, even though they had anticipated it weeks before.

{¶ 24} Regarding relators' claims challenging the constitutionality of residency requirements for circulators, pursuant to R.C. 3503.06, relators were circulating part-petitions for the Nader candidacy as early as June 2004. At that time, they should have known of the residency requirements for circulators and that some of their circulators did not fulfill those requirements. But instead of challenging the constitutionality of these requirements at that time, they waited until about *four months thereafter* before raising these claims in this expedited-election case. In a separate case, the Nader campaign acted more expeditiously in challenging the constitutionality of Texas election statutes. See *Nader v. Connor* (W.D.Tex. 2004), 332 F.Supp.2d 982, affirmed (C.A.5, 2004), 388 F.3d 162 (Nader and supporter of his campaign for president sought declaratory and injunctive relief to invalidate as illegal and unconstitutional a Texas election statute as applied to Nader).

{¶ 25} Relators failed to act with the requisite diligence in asserting their claims. Instead, they delayed at least *31 days* before raising their claim concerning unprocessed voter-registration applications and about *four months* before challenging the constitutionality of statutory requirements for petition circulators. See *State ex rel. Demaline v. Cuyahoga Cty. Bd. of Elections* (2000), 90 Ohio St.3d 523, 526–527, 740 N.E.2d 242, quoting *State ex rel. Landis v. Morrow Cty. Bd. of Elections* (2000), 88 Ohio St.3d 187, 189, 724 N.E.2d 775 (" '[W]e have held that a delay as brief as *nine days* can preclude our consideration of the merits of an expedited election case' "). (Emphasis added.) Relators lack any justifiable excuse for this delay.

{¶ 26} In addition, this delay resulted in prejudice. " 'Our consistent requirement that expedited election cases be filed with the required promptness is not simply a technical nicety.' " *Campaign to Elect Larry Carver Sheriff v. Campaign to Elect Anthony Stankiewicz Sheriff*, 101 Ohio St.3d 256, 2004-Ohio-812, 804 N.E.2d 419, ¶ 15, quoting *State ex rel. Carberry v. Ashtabula* (2001), 93 Ohio St.3d 522, 524, 757 N.E.2d 307. Expedited-election cases "implicate the rights of electors underlying the statutory time limits of R.C. 3505.01 and 3509.01." *Ascani*, 83 Ohio St.3d at 494, 700 N.E.2d 1234. The statutory deadline for having absentee ballots printed and ready for use was September 28, and that date

passed before relators commenced this expedited election case. R.C. 3509.01 (absentee ballots "shall be printed and ready for use on the thirty-fifth day before the day of the election"). "If relators had acted more promptly, this might have been avoided and any potential prejudice to the count[ies] in [their] statutory obligation to absentee voters would have been minimized." *State ex rel. Vickers v. Summit Cty. Council*, 97 Ohio St.3d 204, 2002-Ohio-5583, 777 N.E.2d 830, ¶ 18.

{¶ 27} Relators' delay also prejudiced the Secretary of State and the protesters. If relators had acted more diligently, the Secretary of State would have had more time to defend against relators' claims, including their claims that the statutory requirements for petition circulators are unconstitutional. Instead, the Secretary of State was forced to defend these provisions under the accelerated evidence and briefing schedule for expedited-election cases in S.Ct.Prac.R. X(9). And by waiting to challenge the decisions of the boards of elections, relators essentially guaranteed that if the court granted their primary requested relief— ordering the Secretary of State to compel the boards of elections to compare their records to the updated records and then to review the part-petition signatures that they previously had invalidated—the protesters could not file a statutory protest against the new sufficiency determination. See R.C. 3513.263 ("Written protests against such nominating petitions may be filed by any qualified elector eligible to vote for the candidate whose nominating petition he objects to, *not later than the sixty-fourth day before the general election*"). (Emphasis added.)

{¶ 28} Moreover, granting relators' requested relief at this late date would endanger Ohio's election preparations. As the United States Court of Appeals for the Seventh Circuit recently observed in affirming a federal district court's denial of a preliminary injunction sought by the Nader campaign in a ballot-access case challenging the constitutionality of Illinois election provisions:

{¶ 29} "[I]t would be inequitable to order preliminary relief in a suit so gratuitously late in the campaign season. It wasn't filed until June 27, only a little more than four months before the election. If when he declared his candidacy back in February Nader had thought as he does now that the Illinois Election Code unconstitutionally impaired his chances of getting a place on the ballot, he could easily have filed suit at the same time that he declared his candidacy—especially as he had filed a similar suit the last time he ran for President, in 2000 * * *. * * *

{¶ 30} "By waiting as long as he did to sue, and despite the strenuous efforts by the district court and this court to expedite the litigation, Nader created a situation in which any remedial order would throw the state's preparation for the election into turmoil. Absentee ballots have already been mailed to voters * * *.

{¶ 31} "We are mindful that the right to stand for office is to some extent derivative from the right of the people to express their opinions by voting * * *. [N]othing is more common than for the denial of an injunction to harm innocent nonparties, such as people who would like to vote for Nader * * *. But there are innocents on the other side as well—namely people who will be harmed if a last-minute injunction disrupts the Presidential election in Illinois." *Nader v. Keith* (C.A.7, 2004), 385 F.3d 729, 736–737.

{¶ 32} Based on the foregoing, relators' delay in raising these claims prejudiced the Secretary of State, the protesters, election officials, and electors. Therefore, laches bars relators' mandamus claims, and we deny the writ based on laches.

## R.C. 2731.04

{¶ 33} In addition to laches, the Secretary of State and the protesters assert that this expedited-election case in mandamus must be dismissed because relators failed to bring this action in the name of the state on their relation.

{¶ 34} R.C. 2731.04 provides that an action for a writ of mandamus "must be * * * in the name of the state on the relation of the person applying." The court has dismissed petitions for writs of mandamus when, inter alia, the action was not brought in the name of the state on the relation of the person requesting the writ. See *Gannon v. Gallagher* (1945), 145 Ohio St. 170, 171, 30 O.O. 351, 352, 60 N.E.2d 666; *Maloney v. Court of Common Pleas of Allen Cty.* (1962), 173 Ohio St. 226, 227, 19 O.O.2d 45, 181 N.E.2d 270; *Maloney v. Sacks* (1962), 173 Ohio St. 237, 238, 19 O.O.2d 51, 181 N.E.2d 268.

{¶ 35} Nevertheless, when a failure to comply with R.C. 2731.04 is raised and relators file a motion for leave to amend the caption of the complaint to specify that the mandamus action is brought in the name of the state on their relation, we have granted leave to amend so as to resolve cases on the merits rather than on a pleading deficiency. *State ex rel. Rust v. Lucas Cty. Bd. of Elections*, 100 Ohio St.3d 214, 2003-Ohio-5643, 797 N.E.2d 1254, ¶ 6; *State ex rel. Huntington Ins. Agency, Inc. v. Duryee* (1995), 73 Ohio St.3d 530, 533, 653 N.E.2d 349.

{¶ 36} If, however, a respondent in a mandamus action raises this R.C. 2731.04 defect and relators fail to seek leave to amend their complaint to comply with R.C. 2731.04, the mandamus action must be dismissed. *Litigaide, Inc. v. Lakewood Police Dept. Custodian of Records* (1996), 75 Ohio St.3d 508, 664 N.E.2d 521. As of October 18, the date that relators' final brief was due, relators had failed to seek leave to amend their complaint to comply with R.C. 2731.04.

{¶ 37} Because the Secretary of State raised this objection in his October 8 dismissal motion, the protesters reiterated this objection in their October 15 merit brief, and relators failed to respond by moving for leave to amend the case

caption, we also deny the requested extraordinary relief in mandamus based on relators' failure to comply with R.C. 2731.04.

## Conclusion

{¶ 38} Based on the foregoing, we deny the requested extraordinary relief in mandamus based on laches and relators' failure to comply with R.C. 2731.04. These determinations render relators' claims moot.

Writ denied.

RESNICK, Acting C.J., BRYANT, F.E. SWEENEY, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

O'DONNELL, J., concurs separately.

PFEIFER, J., dissents.

THOMAS F. BRYANT, J., of the Third Appellate District, sitting for MOYER, C.J.

----

**O'DONNELL, J., concurring.**

{¶ 39} Although I concur with the majority regarding the admission of Professor Mark R. Brown to appear pro hac vice and regarding the denial of the writ, I do not agree that laches bars the relators' mandamus claims under the circumstances of this case. For this reason, I also join that portion of Justice Pfeifer's opinion with respect to his position on laches.

{¶ 40} The record before us reflects that relators timely submitted a joint statement of candidacy and nominating petition requesting that Ralph Nader and Miguel Camejo be certified as independent candidates for the offices of President and Vice–President of the United States at the November 2, 2004 election in Ohio. The Secretary of State forwarded the nominating part-petitions to the respective boards of elections for validation of the signatures contained on them. Thereafter, on August 30, 2004, intervenors filed a written protest with the Ohio Secretary of State challenging the validity of certain signatures on the part-petitions.

{¶ 41} On September 21, pursuant to the local boards of elections' determination that 6,464 of 14,473 signatures were valid, the Secretary of State issued a preliminary certification and placed Nader and Camejo on the Ohio ballot for the presidential election. A week later, however, after the protest hearing had been concluded, the Secretary of State accepted the report of the hearing officer and determined that 2,756 of the 6,464 signatures were invalid; accordingly, he ordered the local boards of elections to remove Nader and Camejo from the presidential ballot or to otherwise notify voters that any votes cast for them

would not be counted. Six days after that determination, relators filed their mandamus action in this court.

{¶ 42} The majority holds that relators failed to act with the requisite diligence in raising their claims concerning the voter-registration-application backlogs at the local county boards of elections and in challenging the constitutionality of the statutory requirements for petition circulators. Regarding the backlog claims, the majority attributes a 31–day delay to the relators, since they challenged only the invalidation of the 8,009 signatures, which had been known to them on September 3: the date when the individual boards were required to submit their decisions regarding signature validation to the Secretary of State. The majority also emphasizes that relators waited until the day before the protest hearing to request board records regarding the validation process and did not present any evidence or argument concerning any backlog at that hearing.

{¶ 43} In my view, the majority's analysis fails to account for the fact that, until the Secretary of State removed Nader and Camejo from the ballot on September 28, those candidates had sufficient valid signatures to warrant certification—and they had, in fact, been placed on the presidential ballot. Therefore, because the candidates had been placed on the ballot, any challenge to the original 8,009 invalidated signatures prior to September 28 would have been premature. It was not until September 28, when the candidacies were ordered off the ballot, that challenges to those invalidated signatures became meaningful. Accordingly, I would hold that the relators did not unreasonably delay in asserting their position regarding those signatures.

{¶ 44} For the same reasons and contrary to the majority's holding, I believe that relators did not unduly delay in challenging Ohio's residency requirements for petition circulators. The majority complains that relators waited approximately four months before raising these challenges and apparently should have submitted these challenges when they began circulating the petitions. However, until they were ruled off the ballot, they had no reason to mount any legal challenge to any ruling regarding invalidated signatures. The only delay here consisted of the time relators took to file their mandamus complaint on October 4, 2004, just six days after the Secretary of State had ruled them off the ballot. For a national presidential candidate to react to a Secretary of State's ruling in one state by drafting and filing a complaint in a court of law within six days is not laches—it is a remarkably timely reaction to a changing election environment. Accordingly, I dissent from this part of the majority's analysis.

{¶ 45} I concur with the majority's decision, however, because the relators have failed to demonstrate entitlement to a writ of mandamus, which would necessitate a showing of a clear legal right to the relief requested, a corresponding duty on the part of the respondent, and no adequate remedy in the ordinary course of

law. See *State ex rel. Moore v. Malone*, 96 Ohio St.3d 417, 2002-Ohio-4821, 775 N.E.2d 812, at ¶ 20. Relators have not established on this record the existence of 1,292 valid signatures to meet the 5,000–signature requirement for certification. Instead, they have merely suggested that, upon further or re-examination of the petition, they might have enough valid signatures to permit Nader and Camejo to be placed on the ballot. Accordingly, I concur with the decision of the majority to deny the writ, but not on the basis of laches.

PFEIFER, J., concurs in the portion of the foregoing concurring opinion regarding laches.

---

**PFEIFER, J., dissenting.**

{¶ 46} I have long been against the application of laches as a first resort in election cases. *State ex rel. Ascani v. Stark Cty. Bd. of Elections* (1998), 83 Ohio St.3d 490, 495, 700 N.E.2d 1234 (Pfeifer, J., concurring). The rights to vote and to petition a government are the most basic and cherished of our fundamental rights, and we should endeavor to resolve election issues substantively whenever possible.

{¶ 47} Laches is especially not applicable here because relators did not sit on their rights. Nader's supporters learned on September 8 that they had successfully submitted a sufficient number of signatures on their nominating petition. On September 21, the Secretary of State preliminarily certified the petition, provisionally placing Nader on the ballot. To what end would Nader supporters have contested the Secretary of State's certification of a legally sufficient number of signatures? Nader's supporters were properly on the way to the next aspect of their campaign—their job was to be planting yard signs, not planting premature motions in Ohio courthouses. Only after the four-week review and hearing of the protest culminating in the Secretary of State's September 28 decision did the county boards' rejection of 8,009 signatures become significant. It was the Secretary of State who waited three weeks to hold a hearing on the protesters' claim and nearly one month, all told, to rule on the protest. A decision to remove Nader from the ballot was issued the day that absentee ballots were to be first mailed. That bell could not be unrung. Relators filed the present action within six days, two of which were weekend days.

{¶ 48} At this point, absentee ballots have been mailed, and many have been returned to local boards of elections. We cannot have a 2004 presidential election in which Nader's name appears on all of the ballots. The time has passed here for the best result, leaving us to find the best result possible. Assuming that a review of rejected signatures would yield the remaining number necessary for Nader to get on the ballot, what would be the best result? Because some

absentee voters were unable to cast a vote for Nader, should voters casting ballots on election day also be denied that right?

{¶ 49} It is important that a properly certified Nader appear on the Ohio presidential ballot. That is not because of the unknowable effect his presence would have on a closely divided presidential election in Ohio, but because his supporters have the right to be heard as much as supporters of the other candidates. As many electors as possible should have the option to cast a vote for Nader—the fact that some cannot have that option does not mean that most should not. Pursuant to R.C. 3509.01, absentee ballots are to be available for use 35 days before an election. A universe of potential change lies before voters 35 days out—their favored candidate could die, be unmasked, commit a felony, or change his stance on an important issue—but that is the risk that absentee voters take. The world need not stand still to protect the rights of the absentee voter:

{¶ 50} "The casting of an absentee ballot is a privilege and not an absolute right. It is a privilege accorded individuals who, because of their own business, or their own pleasure, see fit not to be within the jurisdiction, or within the municipality, on election day. They must take the situation as they find it. If they have absented themselves from the voting place at the time the issue is presented properly, they have so absented themselves at their own risk." *Portmann v. Bd. of Elections of Stark Cty.* (1938), 60 Ohio App. 54, 60, 13 O.O. 420, 19 N.E.2d 531.

{¶ 51} Therefore, we should not let the release of absentee ballots restrain this court from ordering a modification of the election-day ballot to include Nader as a choice for president if the facts and law merit his inclusion.

{¶ 52} The law and the process relied upon by the county boards and the Secretary of State to remove Nader from the ballot are dubious. Local boards made their decisions assuming the continued viability of R.C. 3503.06, which provides:

{¶ 53} "No person shall be entitled * * * to sign or circulate any declaration of candidacy or any nominating, initiative, referendum, or recall petition, unless the person is registered as an elector and will have resided in the county and precinct where the person is registered for at least thirty days at the time of the next election."

{¶ 54} R.C. 3503.06 violates the constitutional rights of the Nader circulators by requiring them to be registered voters and Ohio residents. The United States Supreme Court in *Buckley v. Am. Constitutional Law Found., Inc.* (1999), 525 U.S. 182, 194–195, 119 S.Ct. 636, 142 L.Ed.2d 599, explicitly found a Colorado statute requiring circulators of initiative petitions to be registered voters to be violative of the First Amendment's free-speech guarantee.

{¶ 55} The *Buckley* majority declined to address the constitutionality of residency requirements. We should now make an explicit determination on the constitutionality of the circulator-residency requirement in this case. In *Buckley,* the court was addressing initiative petitions circulated in Colorado. Obviously, those initiatives affected only Coloradoans. Here, where we are dealing with a presidential election, our only national election, the national interest is at issue. In this instance, First Amendment considerations must outweigh a state's interest in keeping local issues settled by local voters. I would therefore hold that R.C. 3503.06 as applied to presidential elections is unconstitutional as to both residency and registration requirements.

{¶ 56} We do not know to what extent registration or residency affected the boards of elections' decisions on the 8,009 rejected signatures. We should order the Secretary of State to make that determination and any necessary correction.

{¶ 57} The outcome in this case also is the result of a flawed process. Relators allege that boards of elections may have ignored the petitions of circulators whose voter registrations were filed but unprocessed. Before going to the extraordinary measure of removing a name from the ballot, the Secretary of State should have ordered the local boards to determine whether the registrations of circulators were up to date. Not doing so constituted an abuse of discretion and a violation of the Secretary of State's statutory duty to oversee county boards of elections. R.C. 3501.05(M). The decision to remove Nader from the ballot was the direct result of an overtaxed voter-registration system that lacked statewide oversight.

{¶ 58} To assume that it is too late to correct the errors of the Secretary of State is to sell the electoral process short. The election is not until November 2—we should make every effort until that time to present Ohio's electors a representative ballot.

{¶ 59} I accordingly dissent, would grant relator's mandamus action, and would order the Secretary of State to conduct a review of the 8,009 rejected signatures to determine how many were rejected due to residency or registration status or because the circulator's registration had not yet been processed. The intervenors-protesters should also be given the opportunity to challenge on an expedited basis any signatures newly certified. If, under this review and under these new standards Nader reaches 5000 valid signatures, his name should be added to the election-day ballot.

O'DONNELL, J., concurs in the portion of the foregoing dissenting opinion regarding laches.

---

Cassidy & Associates and Michael P. Cassidy; Mark R. Brown, for relators.

Jim Petro, Attorney General, Richard N. Coglianese and Damian W. Sikora, Assistant Attorneys General, for respondent.

Law Offices of Donald J. McTigue and Donald J. McTigue; Kirkland & Ellis and Andrew B. Clubok, for intervening respondents.